[No. B054042. Second Dist., Div. Three. Sept. 16, 1993.]

DUNN-EDWARDS CORPORATION et al., Plaintiffs and Appellants, v. SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT, Defendant and Respondent.

## COUNSEL

Donnelly, Clark, Chase & Smiland and William M. Smiland for Plaintiffs and Appellants.

Ronald A. Zumbrun and Robin L. Rivett as Amici Curiae on behalf of Plaintiffs and Appellants.

Peter M. Greenwald, Barbara Baird, Shute, Mihaly & Weinberger and Alletta d'A. Belin for Defendant and Respondent.

## OPINION

**KITCHING, J.**—Twenty California paint manufacturers, contractors, and dealers (the Paint Companies) appeal from portions of the judgment granting in part and denying in part their petition for writ of mandate to compel the South Coast Air Quality Management District (the District) to further assess the environmental implications of certain amendments to District rule 1113, adopted on February 2, 1990 (Rule 1113).

The amendments in question were designed to abate emissions of volatile organic compounds (VOC's) from a number of types of architectural coatings by imposing restrictions on their content. The Paint Companies sought to invalidate the amendments relating to six of the coatings, including "non-flat" (enamel) coatings, on the ground the District violated the Califor-

nia Environmental Quality Act (CEQA, Pub. Resources Code, § 21000 et seq.) by ignoring seven adverse environmental impacts of each of the six amendments.

The trial court determined the District adequately addressed all environmental issues with respect to nonflat coatings. However, the court found the District failed to adequately address thinning issues relating to the other five coatings in the manner required by CEQA and the District's regulatory program thereunder, and issued a writ of mandate compelling the District to do so. The petition was denied in all other respects.

On this appeal, the Paint Companies challenge all of the trial court's findings as to nonflat coatings, and all of its findings, except thinning, as to the remaining coatings.[1] We determine the findings are proper in all challenged respects, and affirm the judgment.

FACTS

1. *Background.*

Under the federal Clean Air Act (42 U.S.C. § 7401 et seq.), the Environmental Protection Agency (EPA) sets primary ambient air quality standards for a number of pollutants, including ozone, at levels "requisite to protect the public health." (42 U.S.C. § 7409(b)(1).)[2] Each state is required to adopt a plan providing for implementation, maintenance and enforcement of the national ambient air quality standards. (42 U.S.C. § 7410(a)(1); Health & Saf. Code, § 39000 et seq.)

In California, the Air Resources Board (ARB) is the state agency charged with coordinating efforts to attain and maintain ambient air quality standards, and to conduct research into the causes of and solution to air pollution. (Health & Saf. Code, § 39003.) ARB has adopted ambient air quality

---

[1]The District voluntarily dismissed its appeal from that portion of the judgment requiring additional consideration of the thinning issues.

[2]Pursuant to the District's request, we take judicial notice of its air quality management plan for the South Coast Air Basin, dated March 1989, including the following comments regarding ozone: "Ozone is formed by photochemical reactions between directly emitted [nitrogen dioxide] and reactive organic gases (ROG). ROG is formed from combustion of fuels and from evaporation of organic solvents. Elevated ozone concentrations result in reduced lung function, particularly during vigorous physical activity. This health problem is particularly acute in children. [¶] Ozone levels in the South Coast Air Basin are approximately three times the federal standard. They are significantly higher than anywhere else in the nation, and in 1985 exceedances [*sic*] of the standard occurred nearly four times as often as in the next highest area."

standards for each of the air quality basins in the state, including the South Coast Air Basin (Health & Saf. Code, § 39606).

The state Legislature has determined that local and regional authorities have the primary responsibility for control of air pollution from all sources other than emissions from motor vehicles. (Health & Saf. Code, §§ 39002, 40000); hence, the formation of air pollution control districts and air quality management districts, which are empowered to adopt and enforce rules and regulations designed to achieve and maintain federal and state ambient air quality standards for the areas under their jurisdiction. (Health & Saf. Code, §§ 40001, 40440.)

### 2. The Proposed Rule 1113 Amendments.

Rule 1113, "Architectural Coatings," was adopted by the District in 1977, and thereafter amended 11 times prior to adoption of the present amendments in February 1990.

In 1989, the District proposed to amend Rule 1113 in such a manner as to result in additional VOC reductions of 4.5 tons per day over the then current version of the rule. This reduction was to be achieved by lowering the allowable VOC content per liter of coating. According to the District, the VOC content requirements could be met by either replacing noncomplying coatings with existing complying coatings or by formulating new coatings.[3]

Pertinent to our discussion are the VOC limits imposed by the Rule 1113 amendments upon the following coatings: (1) quick-dry enamels, (2) quick-dry primers, sealers, and undercoaters, (3) industrial maintenance coatings, (4) lacquers, and (5) aerosols. Also pertinent are the VOC limits applicable to (6) nonflat coatings (enamels).

Prior to the amendments at issue, Rule 1113 included a special category known as "quick-dry enamels," with a VOC limit of 400 grams per liter (g/L). The proposed amendments eliminated this category; as a result, such coatings fell within the category of "non-flat" coatings (enamels), which have a VOC limit of 250 g/L.

The proposed amendments also eliminated the special category of "quick-dry primers, sealers, and undercoaters," which had a VOC limit of 450 g/L.

---

[3]The proposed amendments had their origin in, and closely paralleled, a suggested control measure (SCM) prepared by the architectural coatings committee of the technical review group (TRG), then adopted by ARB and distributed to the districts for their consideration. The committee is composed of representatives of various air pollution and air quality management districts, including the District, and of ARB and EPA.

These coatings then fell within the 350 g/L limit applicable generally to primers, sealers, and undercoaters.

The proposed amendments revised and clarified the definitions of industrial maintenance coatings, and prohibited use of these coatings for nonindustrial applications. They also prohibited use of high temperature coatings for regular industrial, commercial, or institutional facilities. High temperature coatings were subject to VOC limits of 650 g/L rather than the 420 g/L limit applicable to regular industrial coatings. The proposed amendments set lower VOC limits to become effective in December 1993.

The proposed amendments established a two-step reduction, to take effect in 1990 and 1994, in the existing VOC limit of 680 g/L for lacquers.

In 1987, Rule 1113 was amended to provide that nonflat coatings (enamels) manufactured prior to September 2, 1989, would be subject to a VOC limit of 380 g/L. Such coatings would thereafter be subject to the general architectural coatings limit of 250 g/L. This limit was not changed by the proposed amendments.

### 3. Environmental Documents.

#### a. The Determination of No Significant Environmental Impacts.

On November 30, 1989, the District issued a notice of intent to file a determination of no significant environmental impacts for proposed amended Rule 1113 (the proposed determination), inviting public comment concerning the proposal.

The proposed determination included an environmental checklist identifying several areas of potential adverse environmental impacts: air quality, risk of upset, transportation/circulation, public services—fire protection, public services—other government services (District impacts), solid waste disposal, and human health.

The proposed determination included a discussion of these potential environmental impacts and mitigation measures with respect to each. The discussion of air quality related only to transport of excess paint materials to landfills or distribution centers outside of the South Coast Air Basin.

Under "Human Health Impacts," the District stated: "IMPACT: Some of the exempt solvents or other solvents used to attain the VOC emission limits required by the Proposed Amended Rule may affect public and worker

health. In some cases, actual effects on human health have not been determined, and in other cases laboratory studies indicate potential negative health effects. Accidental release of these substances during transport may also affect public health." Under "MITIGATION," the District discussed only California Occupational Safety and Health Administration (OSHA) regulations for the protection of workers who handle hazardous materials.

In its discussion of a proposed mitigation monitoring plan (Pub. Resources Code, § 21081.6), the District stated that upon further analysis, impacts in all areas except human health had been determined to be insignificant. With respect to human health, the District repeated its earlier statement regarding environmental impacts. The proposed mitigation monitoring plan again referred solely to worker safety, and again relied upon OSHA.

The District determined that although the proposed amendments could have a significant effect on the environment, there would not be a significant effect in this instance because of the described mitigation measures.

### b. *The District Staff Report.*

The proposed amendments were summarized in a staff report compiled by the District rule development division, dated December 7, 1989. The staff report set forth the staff recommendation with respect to each proposed amendment, as well as a discussion of pertinent issues raised by the industry or the architectural coatings committee of TRG, essentially as follows:

### i. *Quick-dry enamels.*

District staff recommended elimination of the special category for quick-dry enamels, which would then fall within the nonflat coating category. It was felt the quick-dry category may have been used as a loophole to allow manufacturers to market nonflat coatings above the 250 g/L limit applicable to such coatings.

Staff discussed the adequacy of complying products, including industry complaints concerning drying time, blocking, yellowing of whites, and lack of gloss. It was felt that rapidly progressing technology would result in development of resins which would allow formulation of enamels with improved appearance and performance properties. In the meantime, staff concluded consumers would be able to adjust to the new generation of nonflat coatings by learning new application techniques, and settling for less glossy finishes in their kitchens and bathrooms.

Staff rejected as too difficult to enforce a proposal of the Environmental Legislative and Regulatory Advocacy Program of the Southern California

Paint and Coatings Association (EL RAP) to limit the use of quick-dry enamels to cases where the painted surface must be returned to service within a 12-hour period for reasons of security, safety, or essential public service. Also rejected was a proposal to gradually phase down the VOC limits for quick-dry enamels, as that would not take advantage of currently available complying products.

ii. *Quick-dry primers, sealers, and undercoaters.*

Staff recommended elimination of the special category for quick-dry primers, sealers, and undercoaters, to eliminate "what has become a very popular loophole in the architectural coating rules," and because "the technology is currently available to formulate primers, sealers and undercoaters at or below 350 g/L that have dry times approaching that of the quick-dry category."

iii. *Industrial maintenance coatings.*

Staff recommended that residential users be prohibited from using industrial maintenance coatings. In addition, the report recommended the immediate lowering of the VOC limits for such coatings based on currently available technology, and further lowering three years later to allow time for reformulation and product development.

Staff claimed most of the issues pertaining to this category had been resolved.

iv. *Lacquers.*

Staff recognized that reduction of the solvent content of lacquers was controversial. For that reason, it recommended a 3-step reduction in VOC limits for lacquers, from the then present 680 g/L to 550 g/L after one year, and 275 g/L in another 3 years, to allow time for development of satisfactory products with reduced solvent levels. Staff acknowledged industry concerns with clarity, rapid drying, yellowing, and ease of touch-up.[4]

---

[4]The parties agree the Paint Companies' complaints about the effect of the proposed rule amendments on aerosols are moot, as the District subsequently adopted a new District rule 1129 applicable to such coatings. Rule 1129 was the subject of other petitions for writ of mandate, and another appeal (B065562).

Staff did not discuss nonflats (enamels), presumably because of the District's position that the proposed rule amendments did not affect the composition of these coatings.

4. *Public Response to the Proposed Determination.*

The District received 10 timely responses to its request for public comment on the proposed determination. The responses all came from industry sources.

EL RAP claimed the District could not lawfully file the proposed determination because it was required to prepare a full environmental impact report (EIR) prior to considering the proposed amendments.

EL RAP's position was essentially that adoption of the proposed amendments would significantly increase air pollution, rather than reducing it. This is because the amendments would increase VOC emissions in six ways, and also increase the reactivity of such emissions.

According to EL RAP, increases in VOC emissions would result from: (1) increased use of solvent-borne primers, sealers, and undercoaters because of inferior topcoats; (2) increased use of thinners because of difficulty in handling new coatings; (3) use of more coating to cover a given area because the new coatings would produce a thicker film; (4) application of more coats to produce a satisfactory finish; (5) more immediate job failures requiring recoating; and (6) impaired durability, yellowing, and chalking of new coatings, requiring more frequent recoatings.

EL RAP maintained that water-borne coatings contain glycols and glycol ethers, which may be up to 10 times more reactive with nitrogen oxides, and thus produce substantially more ozone, than the mineral spirits commonly contained in solvent-borne coatings.

The other nine responses to the District's proposed determination essentially reiterated EL RAP's concern that the proposed amendments to Rule 1113 would result in architectural coatings of inferior quality requiring increased usage of such coatings and therefore, increased VOC emissions. In short, the industry argued the proposed amendments would be counter-productive.

In addition, Dunn-Edwards Corporation claimed feasible alternatives existed in the form of other regulatory strategies, including performance-based

standards, restrictions on time and place of application, manufacturer limits, and emission charges.[5]

5. *The District's Response to Industry Criticism of the Proposed Determination.*

Responding to the foregoing criticisms, the District pointed out that at workshops held prior to promulgation of the SCM, the architectural coatings committee of TRG had asked industry representatives for technical documentation demonstrating that the proposed amendment would result in increased use of solvent-borne primers, sealers, and undercoaters. No such documentation was provided at that time, and none was supplied in support of the present criticism. The District claimed available evidence suggested there would be no increase in VOC emissions because in many cases, low VOC coatings may be as durable as solvent-borne coatings.

With respect to industry complaints that the amendments would require application of additional coats of some of the affected materials to achieve satisfactory results, the District claimed, citing an example, that usage would have to increase fivefold to result in VOC emissions equivalent to those produced by coatings meeting the prior standards.

The District also claimed the quality and availability of water-borne coatings and low solvent coatings have improved steadily over a period of several years due to the diligent efforts of resin manufacturers and paint companies which appear to be attributable, at least in part, to the imposition of strict standards since 1987. In addition, there are many advantages to using water-borne products, including easy cleanup and minimization of hazardous wastes requiring disposal.

With regard to reactivity, the District challenged the accuracy of industry claims on behalf of mineral spirits, and pointed out uncertainties in the reactivity data for glycols, stating: "Rule 1113 encourages the reduction of solvent/solid ratio and is not designed to boost the use of glycols and their derivatives. Evidence available to the District suggests that there is no difference in reactivity between solvent-borne coatings and water-based coatings. [¶] Water-based coatings are preferred over solvent-based because the quantity of organic additives and emulsifiers included in the water-based coatings is less than that used for solvent-based coatings. The comments

---

[5]Additional similar comments were received by the District following the comment deadline and up through the February 1990 hearing date, and considered by the board insofar as they did not provide new data. It should be noted that one manufacturer, The Sherwin Williams Company, substantially approved of the proposed amendments.

made on reactivity do not consider this quantity difference. The District encourages the use of water-based coatings on the basis that there are true VOC emission reductions."

The District discussed the behavior of paint solvents in the atmosphere, and concluded that since more molecules of mineral spirits are required for solvent-based coatings, there is a greater potential for ozone formation due to the use of such coatings.

In response to Dunn-Edwards's comment, the District described alternative strategies it had considered and presently had under consideration, and stated it would welcome any additional strategies for consideration and possible adoption in connection with a future rule revision.

The District stated: "District staff has reevaluated the Environmental Checklist based on the . . . industry comment letters received on the Determination of No Significant Environmental Impacts prepared for the Proposed Amendments to Rule 1113. Staff has determined that the inclusion of various mitigation measures provided as well as the two year grandfather clause [for implementation of the rule amendments] reduces any potentially negative environmental impacts to a level of insignificance. Staff has reviewed the issues raised by [EL RAP's] letter with respect to air quality, odor, housing, public service, human health, aesthetic, and historic structure impacts and concludes that, although there may be the potential for impacts in these areas, further analysis indicates they were not significant based on the available body of evidence. Further, because many low VOC coatings are currently available, effects on the categories mentioned by the commentator will not be significantly exacerbated as a result of implementing the Proposed Amendment."

6. *The Hearing.*

A hearing on the proposed amendments to Rule 1113 was conducted on February 1 and February 2, 1990. A number of manufacturers, dealers, and users of architectural coatings testified, reiterating the foregoing concerns as to all categories of high performance coatings. In addition, a representative of Dunn-Edwards Corporation testified regarding the reactivity of VOC emissions from solvent-borne and water-borne coatings. Industry representatives argued at length in favor of a full EIR, rather than the proposed determination.

A representative of the Sherwin Williams Company testified in favor of the proposed amendments, requesting only, in the interest of statewide

uniformity, that the District adopt the three-year grandfather period suggested by the SCM for depletion of existing stores of noncomplying coatings, rather than the two-year period provided in the proposed rule amendments.[6]

A representative of Armor All Protective Coatings Division supported the proposed rule amendments with respect to industrial maintenance coatings, requesting only that manufacturers be permitted to continue supplying thinning recommendations with the product, rather than on the label as required by the amendments, or that manufacturers be given one year to comply with the proposed labelling requirement.

Responding to industry complaints, Dan Donahue, manager of the solvents control section for ARB and chairman of the architectural coatings committee of TRG, testified to the importance of rule uniformity throughout the state. He stated the issues of durability and performance had been subjected to a nine-month process of review, during which no hard data supporting the industry claims had been produced. He pointed out that even with more frequent recoatings, use of water-based coatings at about 100 g/L, as opposed to quick-dry products at about 450 g/L, would result in a net decrease in VOC emissions. He cited an article in the Journal of Coating Technology reporting a five-year exposure study of outside residential wood coatings finding that latex paints were superior to old alkyd coatings. Finally, Donahue testified the rule amendments would result in less than a 10 percent reduction in VOC emissions from the affected products, which is a reasonable goal which all concerned parties should work together to attain.

Pat Nemeth, District Deputy Executive Officer/Planning & Rules, testified the rule amendments called for a reduction of four and one-half tons per day, or 7 percent, from this source category. She stated: "We're not here arguing . . . whether or not water-base paints are superior to oil-base paints. That's not the issue. We are here suggesting and urging this [District] Board to support the concept that water-base paints are an acceptable alternative."

Nemeth presented samples of materials coated with water-based and oil-based lacquers, challenging the Board members to distinguish between the two. She pointed out that the rule amendments did not change the standard for nonflat coatings, but merely eliminated an exemption for quick-dry enamels.

With respect to durability, Nemeth stated the original proposal contained a provision permitting a higher VOC limit category with the assurance that the

---

[6]This recommendation was adopted by the District.

product would not be subject to recoating within a 10-year period. That proposal was not supported by the industry.[7]

Asked why the District did not prepare an EIR, Nemeth explained the proposed amendments were the result of work that commenced in 1986 and involved agencies throughout the state, the state and federal governments, as well as the affected industries. The ARB adopted the SCM by a resolution stating no significant adverse environmental impact associated with the SCM had been identified, and no such effects were likely to result from adoption and implementation of the SCM.

Nemeth discussed the seven points raised by industry representatives. With respect to the claim that users are applying more solvent-borne primers, sealers, and undercoaters to ensure adhesion, she stated available evidence suggests that in many cases low VOC coatings may be as durable as solvent-borne coatings. She also testified sales figures over the years of decreasing VOC limits do not support this industry claim.

With respect to claims of thickness requiring more material to cover a given area, use of more coats to cover, job failure, and yellowing, Nemeth referred the board to the technical document prepared by ARB staff in relation to the SCM, which indicates the quality and availability of water-borne coatings has steadily improved, and that repaintings occur primarily because of consumer preference, rather than necessity.[8]

Nemeth denied that VOC's in oil-based paints are less reactive than those in water-borne coatings, and expressed her willingness to further discuss this issue should the board wish to do so.

Nemeth pointed out that although water-based paints are not superior to oil-based paints, they are improving. "And in this basin with the severity of our air pollution problem, I think we have to go after every emission reduction that's reasonable. . . [a]nd this is a reasonable reduction." She stated water-based products would continue to improve and resolve some of the problems discussed by industry representatives. In addition, staff estimates of VOC emission reductions due to the rule amendments did not take into account the fact that water-based coatings require less use of solvents to clean paint brushes and materials.

---

[7]Although the category is not a subject of this appeal, it should be noted that the District found valid industry concerns regarding VOC limits on coatings for underground pipe, and expressed its willingness to continue to work on this issue, recommending a variance for the one company affected by the rule.

[8]The report attributed any increased product usage to population growth.

In a letter submitted to the board on the second day of the hearing, after the close of evidence, and considered only insofar as it did not provide new data, Nemeth stated District staff had carefully analyzed the issues raised by industry representatives and researched the claim that the proposed amendments would result in an emissions increase. This analysis included a literature search, a complete review of the Rule 1113 permanent file dating back to 1978, available data on paint sales, emissions inventory data, technical work by the EPA, ARB, and other California districts, and a number of site visits. "Staff has concluded that the preponderance of evidence shows that there will be an emission *reduction* from implementation of the proposed amendments." Nemeth went on to summarize the key points of her previous testimony.

### 7. *The District's Decision.*

The District board approved the proposed determination. The board amended the proposed rule amendments to change the grandfather clause from two to three years as described above, and to eliminate an exemption for aerosols. (See fn. 4, *ante.*) The board also voted to establish a committee to monitor implementation of the rule amendments and return to the board with any issues requiring readdressing. As so amended, the proposed amendments to Rule 1113 were adopted.

### CONTENTIONS

The Paint Companies contend there was substantial evidence before the District on the basis of which a fair argument was made that each of the subject amendments to Rule 1113 may have each of the claimed environmental effects. Accordingly, an EIR equivalent was mandatory.

Assuming that is so, the Paint Companies contend the environmental review conducted in this case failed to fulfill the requirements of an EIR equivalent.

### DISCUSSION

### 1. *CEQA Requirements for Certified Regulatory Programs.*

Under section 21080.5 of the Public Resources Code, certified regulatory programs are exempt from CEQA's EIR requirements. The District's regulatory program has been certified by the State Resources Agency and qualifies for this exemption. Therefore, the District is authorized to prepare a substitute document for an EIR or negative declaration. (Pub. Resources

Code, § 21080.5; CEQA Guidelines, Cal. Code Regs., tit. 14, §§ 15250-15253; District rule 110.)[9] The District calls such substitute documents environmental assessments.

All that is required in an environmental assessment is a description of the proposed activity and either (1) a discussion of alternatives to the project and mitigation measures to avoid or reduce any significant or potentially significant effects the project might have on the environment or (2) a statement that there are no significant or potentially significant effects and therefore no alternatives or mitigation measures are proposed. (Guidelines, § 15252; compare and contrast Guidelines, §§ 15120-15132, which list the required contents for EIR'S.)

Under its own rules, the District is required to prepare staff reports considering beneficial as well as adverse environmental impacts associated with proposed rule changes and "a succinct analysis of those impacts." (District rule 110(c).) "If comments are received during the evaluation process which raise significant environmental issues associated with the proposed action, the staff shall summarize and respond to the comments either orally at the public hearing, or in a supplemental written report. Prior to taking final action on any proposal for which significant environmental issues have been raised, the . . . Board shall approve a written response to each such issue." (District rule 110(d).)

2. *Standard of Review.*

The environmental documents in this case are the proposed determination, the staff report prepared for the proposed amendments to Rule 1113, the District's responses to the Paint Companies' environmental objections, and the Nemeth memo. (§ 21080.5; Guidelines, §§ 15250-15252; District rule 110.) Implicit in the District's issuance of the proposed determination, which was based on the staff report, is its conclusion that the rule amendments would have no significant or potentially significant effect on the environment due to poor quality causing increased usage of complying products. We must decide whether the District's responses were sufficiently responsive to industry concerns that the proposed amendments would result in a net increase, rather than a decrease, in VOC emissions.

The District was required to respond to significant environmental questions raised by the Paint Companies. ■ "*Gallegos* v. *State Bd. of Forestry* [1978] 76 Cal.App.3d 945 [142 Cal.Rptr. 86], set forth the controlling

---

[9]Unless otherwise stated, all further section references are to the Public Resources Code. References to Guidelines are to the state CEQA Guidelines. (Cal. Code Regs., tit. 14, § 15000 et seq.)

standard for the sufficiency of the required written responses to significant environmental objections. Adapting the analogous criteria governing responses to objections to a proposed project requiring an EIR, the *Gallegos* court ruled that the responding agency (in that case, the State Board of Forestry) 'need not respond to every comment raised in the course of the review and consultation process, but [the agency] must specifically respond to the most significant environmental questions raised in opposition to the project.' (*Id.*, at p. 954; see *People* v. *County of Kern* (1974) 39 Cal.App.3d 830 [115 Cal.Rptr. 67].) Such responses must include a description of the issue raised 'and must particularly set forth in detail the reasons why the particular comments and objections were rejected and why the [agency] considered the development of the project to be of overriding importance.' (*Id.*, at p. 841.)" (*Environmental Protection Information Center, Inc.* v. *Johnson* (1985) 170 Cal.App.3d 604, 628 [216 Cal.Rptr. 502].)

All that is required is that the documents be responsive to the opposition (*Karlson* v. *City of Camarillo* (1980) 100 Cal.App.3d 789, 807 [161 Cal.Rptr. 260], citing *City of Rancho Palos Verdes* v. *City Council* (1976) 59 Cal.App.3d 869, 894-895 [129 Cal.Rptr. 173]), and provide the members of the District board with information which enables them to make a decision which intelligently takes account of the environmental consequences. (*Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283 [118 Cal.Rptr. 249, 52 P.2d 1017]; *San Francisco Ecology Center* v. *City and County of San Francisco* (1975) 48 Cal.App.3d 584, 594 [122 Cal.Rptr. 100].)

"[A] court's inquiry in an action to set aside an agency's decision under CEQA 'shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' " (*Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 392 [253 Cal.Rptr. 426, 764 P.2d 728], quoting § 21168.5; *No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66].) The court does not pass upon the correctness of the documents' environmental conclusions, but only upon their sufficiency as informative documents. (*Laurel Heights, supra*, 47 Cal.3d at p. 392.)

3. *The District Adequately Responded to the Paint Companies' Comments.*

■ When industry representatives commented upon the proposed determination, District staff responded both in writing and at the hearing. The

District board concluded the Paint Companies' stated concerns were unfounded and therefore did not warrant further consideration. Neither the Guidelines nor District rule 110 requires District analysis of environmental impacts that are insignificant. The District acknowledged that complying products may not be equal in quality to products that produce VOC emissions in excess of the amounts permissible under the rule amendments. However, the District was satisfied the amendments would produce a net decrease of VOC emissions with respect to each challenged category of architectural coatings affected thereby, and therefore, that the rule amendments further the policy of the state to "take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state." (§ 21001, subd. (a); *City of Santee* v. *County of San Diego* (1989) 214 Cal.App.3d 1438, 1449 [263 Cal.Rptr. 340].)

The fact that industry representatives disagree with the District's conclusions is of no legal consequence (Guidelines, § 15151; *Browning-Ferris Industries* v. *City Council* (1986) 181 Cal.App.3d 852, 866 [226 Cal.Rptr. 575]), and neither is the fact that the District did not respond in detail concerning each of the claimed problems in relation to each of the subject coatings. The substance of the perceived problem, i.e., increased use of VOC-emitting architectural coatings due to the claimed inferior quality of coatings that comply with the proposed rule amendments, was recognized by the District board, whose approval of the amendments was made with all relevant environmental consequences in mind. More was not required. (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d at p. 392; *Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d at p. 283.)

In sum, the District properly prepared and approved the proposed Determination.

### DISPOSITION

The judgment is affirmed. Each party to bear its own costs.

Croskey, Acting P. J., and Hinz, J., concurred.

Appellants' petition for review by the Supreme Court was denied December 2, 1993.