[No. B186011. Second Dist., Div. Eight. July 25, 2007.]

REGENCY OUTDOOR ADVERTISING, INC., Plaintiff and Appellant, v. CITY OF WEST HOLLYWOOD et al., Defendants and Respondents; ELEVATION MEDIA et al., Real Parties in Interest and Respondents.

COUNSEL

Jackson, Demarco, Tidus & Peckenpaugh, Michael L. Tidus and Gregory P. Regier for Plaintiff and Appellant.

Michael Jenkins, City Attorney; Jenkins & Hogin and John C. Cotti for Defendants and Respondents.

Gary S. Mobley for Real Parties in Interest and Respondents.

OPINION

RUBIN, Acting P. J.—Regency Outdoor Advertising, Inc., appeals from the trial court's order denying its petition for writ of mandate directing the City of West Hollywood to invalidate a zoning amendment because the city did not review the amendment's environmental effects. We affirm.

## FACTS AND PROCEDURAL HISTORY

In the mid-1990's, West Hollywood adopted its specific plan for Sunset Boulevard to govern that street's development. One of the plan's goals was to spruce up bare walls on the sides of buildings. One way to relieve the visual monotony of blank walls was to place "tall wall signs" on them. For our purposes here, tall wall signs are illuminated outdoor advertising signs of at least 5,000 square feet.

Before 1998, the city did not allow tall wall signs on the sides of buildings with windows. In 1998, the city amended its zoning ordinance to allow tall wall signs where windows were less than 15 percent of the "image area." The city intended the image area rule to mean no more than 15 percent of the sign could cover windows.

Appellant Regency Outdoor Advertising, Inc., is in the billboard and sign business. In 2000, the city permitted Regency to place a tall wall sign on the building at 9229 Sunset Boulevard (9229 Sunset). At the time, the city found Regency's sign did not require review under the California Environmental Quality Act (CEQA). (Pub. Resources Code, § 21000 et seq.)

In 2001, the city again amended its tall wall sign ordinance. Deleting the phrase "image area," the amendment permitted tall wall signs only where windows covered less than 15 percent of the "wall on which the tall wall sign is placed." The city claimed the new language better reflected its reason for allowing tall wall signs, which was to break up the monotony of buildings with bare sides; the side of a building whose surface area was at least 15 percent windows was, on the other hand, sufficiently varied not to need such help to be visually interesting. The 2001 amendment compelled Regency to remove its tall wall sign from 9229 Sunset because windows covered about 25 percent of the wall.[1]

In 2004, the city contemplated amending its tall wall sign ordinance to restore its original "image area" language. Although about a dozen other tall wall signs stood in the city, the proposed amendment affected only 9229 Sunset. Objecting to the amendment, Regency noted that the change to the ordinance's language in 2001 from 15 percent of the "image area" to 15 percent of the wall had forced Regency to remove its sign from 9299 Sunset, resulting since then in three years' lost income. Complaining that competitors (real parties in interest Elevation Media and Sunset Sierra Properties, Inc.) now owned the prospective right to place a tall wall sign on 9229 Sunset, Regency alleged the city was playing political favorites by reviving the earlier language. Regency also objected then, and argues now on appeal, that the city needed to review the restored language's potential environmental effects under CEQA.

Undeterred by Regency's objections, the city adopted Ordinance No. 04-684, which stated the "image area may include the use of windows, provided that

---

[1] When the city loosened its tall wall sign ordinance in 1998, the city's planning staff calculated 9229 Sunset was not eligible for a tall wall sign because windows covered more than 15 percent of the side of the building. In its opening brief, Regency implies that the tall wall sign permit it sought and received in 2000 therefore violated the city's ordinance. The city rejects Regency's implication, however, arguing the city found when it granted Regency's permit that the planning staff had misinterpreted the 15 percent rule. According to the city, the test was not whether windows made up more than 15 percent of the wall's surface, but instead that no more than 15 percent of the sign cover windows, a test the ordinance tried to capture in the phrase "image area." Be that as it may, the lawfulness of Regency's permit is not at issue in this appeal.

windows comprise no more than 15 percent of the image area . . . ." The city asserted that restoring the ordinance's original "image area" language allowed no more than erection of a tall wall sign at 9229 Sunset, the same spot where four years earlier Regency had placed its own tall wall sign without an environmental review. Invoking CEQA's "commonsense" exemption, the city declared it did not need to review the amendment under CEQA because the city could say with "certainty" there was "no possibility" the amendment would have significant environmental effects even under CEQA's broad definition of effects encompassing, for example, visual blight and noise. (Pub. Resources Code, § 21060.5; Cal. Code Regs., tit. 14, §§ 15382, 15061, subd. (b)(3).)

In response to the amended ordinance, Regency filed a petition for a writ of mandate to invalidate the amendment because the city had not subjected it to CEQA review. The trial court sua sponte directed the parties to brief Regency's standing under CEQA and *Waste Management of Alameda County v. County of Alameda* (2000) 79 Cal.App.4th 1223 [94 Cal.Rptr.2d 740] (*Waste Management*), to force the city to conduct an environmental review. After briefing and a hearing, the court found Regency was urging CEQA review to pursue its commercial interests against competitors. Under *Waste Management*, however, CEQA does not create standing to advance one's commercial and competitive interests. The court therefore dismissed the petition and entered judgment for respondents. This appeal followed.

## DISCUSSION

■ Legal standing to petition for a writ of mandate ordinarily requires the petitioner to have a beneficial interest in the writ's issuance. As our Supreme Court explained in *Carsten v. Psychology Examining Com.* (1980) 27 Cal.3d 793 [166 Cal.Rptr. 844, 614 P.2d 276], "The requirement that a petitioner be 'beneficially interested' has been generally interpreted to mean that one may obtain the writ only if the person has some special interest to be served or some particular right to be preserved or protected *over and above the interest held in common with the public at large.*" (*Id.* at p. 796, italics added.) The trial court found Regency demanded environmental review of the amended ordinance in order to promote its commercial or competitive interests. ■ But, CEQA does not create standing to pursue those interests. As *Waste Management* explained: "CEQA is not a fair competition statutory scheme. Numerous findings and declarations were made by the Legislature with respect to CEQA. [Citation.] None of them suggest a

purpose of fostering, protecting, or otherwise affecting economic competition among commercial enterprises. [¶] Thus, [the petitioner's] commercial and competitive interests are not within the zone of interests CEQA was intended to preserve or protect and cannot serve as a beneficial interest for purposes of the standing requirement." (*Waste Management, supra,* 79 Cal.App.4th at p. 1235.)

*Waste Management* involved two competing landfills in separate water districts regulated by different regional water boards. The water board overseeing the first landfill allowed the landfill to accept a particular type of waste without undergoing CEQA review. But, when the second landfill applied for a permit to accept a similar type of waste, the second water board forced it to conduct an environmental review under CEQA. (*Waste Management, supra,* 79 Cal.App.4th at pp. 1230–1231.) To level the playing field by erasing what it perceived to be the first landfill's unfair advantage, the second landfill filed a petition for a writ of mandate to force the first landfill to perform a CEQA review, too. (79 Cal.App.4th at p. 1231.)

The *Waste Management* court found the second landfill had no standing under CEQA to file a petition. (*Waste Management, supra,* 79 Cal.App.4th at p. 1233.) The two landfills were four miles apart, and their water discharges flowed to different bodies of water. Thus, the second landfill suffered no environmental effects from the other landfill that were "over and above" the effects on the general public. (*Id.* at p. 1236.) Accordingly, it had no beneficial interest in a petition compelling CEQA review. Likewise here, Regency cites no *environmental* injury, if any, to its property or itself greater than what the public might suffer from a tall wall sign on Regency's former spot at 9229 Sunset. Thus, the trial court properly found Regency lacked standing to compel CEQA review.[2]

■ Regency contends the trial court erroneously relied on *Waste Management* because the decision is distinguishable in three ways. We find none of the distinctions apposite. As its first distinction, Regency notes the tall wall sign ordinance was a law of general application for the entire city. *Waste Management*, in contrast, involved an application for a single permit. In support of the distinction's relevance, Regency cites *Dunn-Edwards Corp. v. South Coast Air Quality Management Dist.* (1993) 19 Cal.App.4th 519 [24 Cal.Rptr.2d 90] (*Dunn-Edwards*). That decision involved regulations

---

[2] By affirming the trial court's judgment based on Regency's lack of standing, we do not reach the merits of Regency's claim that CEQA's commonsense exemption did not apply to excuse the amended ordinance from environmental review.

affecting an industry, not just one company's permit. *Dunn-Edwards* does not, however, discuss standing. Instead, it focuses on the adequacy of the regulator's response to the industry's claims about the environmental effects of certain proposed regulations. (*Id.* at pp. 521–522, 534–535.) A case is not authority for a proposition it does not address, and therefore *Dunn-Edwards* does not advance Regency's standing argument.[3]

The second distinction Regency draws between *Waste Management* and the city's amended ordinance is the *Waste Management* landfills were several miles apart and not subject to each other's water board. In contrast, the amended ordinance reached Regency's activities because its main offices are within city limits and it owns other billboards in the city. Describing itself as having a "geographical nexus" to the amended ordinance, Regency contrasts its link to the city with what it calls the "geographical boundary" (really a gap) between the *Waste Management* landfills.

The distinction does not persuade us. *Waste Management* discussed the landfills' distance from each other and their emptying into different bodies of water as reasons the landfills did not affect each other's environment. (*Waste Management, supra,* 79 Cal.App.4th at p. 1236.) *Waste Management*'s standing analysis did not, as Regency suggests by focusing on its ties to the city, rest on geographical or political boundaries. Under *Waste Management* it was irrelevant whether different political bodies regulated each landfill or, as here, that Regency is subject to the city's jurisdiction—what mattered was environmental effects, not political boundaries. Unless pollutants could potentially travel from one landfill to the other, the landfills lacked standing under CEQA. (79 Cal.App.4th at p. 1236.) As *Waste Management* explained, "because the effects of environmental abuse are not constrained by artificial political lines, standing to pursue an environmental action is not coterminous with political lines. [Citation.] However, this is a sword that cuts both ways. Real or threatened environmental effects sufficient to establish a beneficial interest will not necessarily extend to all locations within a particular political subdivision and, thus, it is the potential environmental effect, rather than artificial political lines, which is controlling." (*Ibid.*)

■ Regency contends it has an interest in the amended ordinance that is over and above the general public's because the public does not own billboards or tall wall signs—only Regency and a handful of other companies

---

[3] If Regency construes *Dunn-Edwards*'s silence about standing as showing standing was presumed to exist, the same principle applies that a case is not authority for a proposition it does not discuss.

do so. Thus, Regency concludes, it has a beneficial interest in the ordinance's fate. We note Regency is correct that the ordinance more directly affects Regency than the general public. But the amendment does not have *environmental* effects on Regency that are any greater than the effects it has on other businesses and property owners in the city. Hence, the amendment does not bestow CEQA standing on Regency. (*Waste Management, supra,* 79 Cal.App.4th at p. 1233 [Beneficial interest "generally must be special in the sense that it is over and above the interest held in common by the public at large."].)

The third distinction Regency draws between itself and *Waste Management* is the landfill sought to encumber its competitor with the burden of CEQA review. Here, however, Regency's petition imposes that burden on the city, which is not a competitor of Regency. That distinction says nothing, however, about Regency's having a beneficial interest in a petition to compel CEQA review.

Regency contends that instead of relying on *Waste Management,* the trial court should have found *Burrtec Waste Industries, Inc. v City of Colton* (2002) 97 Cal.App.4th 1133 [119 Cal.Rptr.2d 410] to be controlling. We disagree. In that decision, the court found Burrtec had standing to seek a writ compelling a competitor to give public notice under CEQA of the competitor's application for a permit to process solid waste. The *Burrtec* court acknowledged Burrtec would gain economically by forcing its competitor to give notice, but observed that a commercial benefit is not, by itself, disqualifying for standing under CEQA if standing exists on some other ground. (*Burrtec, supra,* at p. 1138.) In *Burrtec,* that additional ground was the public's right to notice, without which the public could not participate in the CEQA proceeding. As Regency explains, "in *Burrtec* it is the lack of an opportunity for public involvement . . . that is so counter to the fundamental purposes of CEQA." Here, in contrast, Regency does not allege it lacked notice of the city's proceedings to amend the ordinance. Instead, Regency simply disagrees with the outcome of those proceedings in which it participated.

■ Regency also contends it has "citizen standing" under CEQA. Ordinarily, corporations may not exercise citizen standing because they are not citizens (even if the law considers them "persons.") (*Waste Management,*

*supra*, 79 Cal.App.4th at p. 1237.) A corporation attempting to vindicate or enforce an important public right may enjoy citizen standing, however, if it meets certain criteria. These criteria include (1) a continuing interest or commitment to the subject matter; (2) by a corporation consisting of or representing individuals beneficially interested in the action; (3) who would find it difficult or impossible to act on their own; and, (4) citizen standing does not conflict with other public policies. (*Id.* at pp. 1237–1238; see also *Imagistics Internat., Inc. v. Department of General Services* (2007) 150 Cal.App.4th 581 [59 Cal.Rptr.3d 18] [affirms the criteria].) Bearing those criteria in mind, we can envision a prototypical corporation with citizen standing would likely be a nonprofit public interest group such as the Sierra Club. The criteria do not, however, apply to Regency, a for profit corporation whose principal activity is owning billboards and tall wall signs.

Regency asserts it satisfied the criteria for citizen standing because it had a continuing interest in the environmental effects of billboards. As evidence, it cites four lawsuits it has filed to compel competing billboard companies to comply with CEQA. The trial court drew an inference from Regency's lawsuits different, however, from what Regency urged. Noting that Regency had a financial interest in each lawsuit's outcome, the court found they demonstrated Regency used CEQA challenges to advance its competitive and commercial interests. The court observed, "[t]hree of the four proceedings are to challenge approvals for billboards given to Regency's competitors, just as this proceeding is, and the fourth proceeding is to contest permits for billboards granted to a developer that would compete with billboards erected and maintained by Regency in the City of West Hollywood." To dispel the aura of self interest masquerading as environmentalism, some evidence is likely to exist of a party's engagement in environmental issues where it had nothing to gain financially. The trial court found Regency's gaggle of lawsuits was not such evidence.

Regency also cites *Marshall v. Pasadena Unified School Dist.* (2004) 119 Cal.App.4th 1241 [15 Cal.Rptr.3d 344] in support of its having citizen standing. In that decision, a public school district awarded a no bid contract to a construction company. A second company sued, claiming a no bid contract violated state law requiring bids for government contracts. The court permitted the lawsuit to proceed, finding the second company had standing as a taxpayer to prevent expenditure of public funds on an unlawful contract. (*Id.* at pp. 1250, 1252.) Regency's lawsuit against the city does not involve the government spending taxpayer money unlawfully.

## DISPOSITION

The judgment is affirmed. Respondents to recover their costs on appeal.

Boland, J., and Flier, J., concurred.