[No. E052253. Fourth Dist., Div. Two. July 31, 2012.]

RIALTO CITIZENS FOR RESPONSIBLE GROWTH, Plaintiff and Respondent, v.
CITY OF RIALTO et al., Defendants and Appellants;
WAL-MART REAL ESTATE BUSINESS TRUST et al., Real Parties in Interest and Appellants.

900

902

COUNSEL

Stradling Yocca Carlson & Rauth, Allison E. Burns, Joseph M. Adams and Reed T.C. Glyer for Defendants and Appellants.

Drinker Biddle & Reath, Henry Shields, Jr., and Paul M. Gelb for Real Parties in Interest and Appellants.

Briggs Law Corporation, Cory J. Briggs and Mekaela M. Gladden for Plaintiff and Respondent.

OPINION

KING, J.—

## I. INTRODUCTION

Defendant, City of Rialto (the City), approved a 230,000-square-foot commercial retail center to be anchored by a 24-hour Wal-Mart "Supercenter" (the project). Plaintiff, Rialto Citizens for Responsible Growth (Rialto Citizens), petitioned the trial court for a writ of administrative mandate invalidating several project approvals, including the City's resolution certifying the final environmental impact report (the EIR) for the project, several resolutions

amending the City's general plan and the "Gateway Specific Plan" governing the project site, and an ordinance approving a development agreement for the project.

The trial court entered judgment in favor of Rialto Citizens and issued a peremptory writ invalidating the challenged resolutions and ordinance. Real parties in interest, Wal-Mart Real Estate Business Trust, Wal-Mart Real Estate Business Trust, Inc., and Wal-Mart Real Estate Trust, Inc. (collectively Wal-Mart), appeal. The City and its redevelopment agency, another named defendant, join Wal-Mart's appeal. Based on our de novo review of the City's actions certifying the EIR and approving the project, we find no prejudicial abuse of discretion on the part of the City. (Code Civ. Proc., § 1094.5.) Accordingly, we reverse the judgment in its entirety.

## II. SUMMARY OF CLAIMS AND CONCLUSIONS

Wal-Mart claims for the first time on appeal that Rialto Citizens lacks standing to challenge the project approvals because neither it nor any of its members are beneficially interested in the issuance of the judgment or writ. Based on the record before us, we conclude that Rialto Citizens has public interest standing. It is therefore unnecessary to determine whether Rialto Citizens or any of its members have a beneficial interest in the issuance of judgment or the writ.

In a separate part of this opinion, we address whether the City violated the Planning and Zoning Law (Gov. Code, § 65000 et seq.)[1] in approving the project. The trial court set aside the City's resolutions approving the general and specific plan amendments and the ordinance approving the development agreement on the ground the City violated the Planning and Zoning Law in two respects. First, the court concluded that the notice of the public hearing on the project before the City Council was defective because it did not include the planning commission's earlier recommendations that the City Council approve the plan amendments and the development agreement. (§§ 65033, 65094.) The court also ruled that the City erroneously adopted the ordinance approving the development agreement without expressly finding that the provisions of the agreement were consistent with the general and specific plans governing the project site, as the Planning and Zoning Law also requires. (§ 65867.5, subd. (b).)

On independent review of these legal questions, we agree with the trial court that the notice of hearing was defective because it did not include the

---

[1] All further statutory references are to the Government Code unless otherwise indicated.

planning commission's recommendations. We also agree that the City erroneously adopted the ordinance approving the development agreement without finding that the provisions of the agreement were consistent with the general and specific plans. Importantly, however, Rialto Citizens made no attempt to show and the trial court did not find that either the defective notice of hearing or the omitted factual finding resulted in prejudice, substantial injury, and that a different result was probable absent these errors or omissions. (§ 65010, subd. (b).) In the absence of these factual findings by the trial court, the resolutions approving the plan amendments and the ordinance approving the development agreement were erroneously invalidated as a matter of law.

In the final part of this opinion, we address whether the City violated the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) in approving the project, specifically in certifying the EIR and in rejecting a "reduced density alternative" as infeasible. The trial court ruled that the EIR was inadequate and therefore erroneously certified because (1) its project description did not identify the development agreement as an approval required to implement the project; (2) it inadequately analyzed the project's cumulative impacts on air quality, traffic, greenhouse gas emissions and global climate change; and (3) it improperly deferred mitigation measures to reduce the project's potential impacts on five special status plant species and three special status wildlife species, namely, the San Bernardino and Stephens' kangaroo rats and the burrowing owl. The court also concluded that insufficient evidence supported the City Council's factual finding, at the project approval stage, that the reduced density alternative to the project was infeasible.

We agree with the trial court that the project description was inadequate because it did not identify the development agreement as an approval required to implement the project. Importantly, however, this omission did not preclude or undermine informed decisionmaking on the project as a whole or the development agreement, because the ordinance approving the development agreement was duly noticed and considered, along with other project approvals, at the public hearing on the project before the City Council.

We also conclude, contrary to the trial court's rulings, that the EIR adequately analyzed the project's cumulative impacts on air quality, traffic, greenhouse gas emissions and global climate change, and did not improperly defer mitigation of potential impacts on any of the special status plant or wildlife species. Lastly, we conclude that substantial evidence supports the City's finding, at the project approval stage, that the reduced density alternative was infeasible.

Thus we find no prejudicial violations of either the Planning and Zoning Law or CEQA in the City's approval of the project.[2]

## III. BACKGROUND

### A. The Project

As approved on July 15, 2008, the project consists of an approximately 230,000-square-foot commercial retail center, anchored by a 24-hour Wal-Mart Supercenter with 197,639 square feet of retail floor space. The Wal-Mart Supercenter would sell general merchandise, groceries, and liquor. It would also include a pharmacy with a "two-lane drive-thru," a vision and hearing care center, food service center, photographic studio and photographic finishing center, banking center, garden center, tire and lube facilities, and outdoor sales facilities.

In addition to the Wal-Mart Supercenter, the project includes four commercial outparcels, a gas station with 16 fueling pumps, and a detention/retention basin for storm water. The project will have a total of 1,143 parking spaces, including 880 on the Wal-Mart Supercenter parcel, and is expected to generate 17,317 additional daily vehicle trips. The project is located on 25.18 acres of vacant land, bounded by San Bernardino Avenue to the north, industrial uses and additional vacant land to the south, Riverside Avenue to the east, and Willow Avenue to the west.

### B. The EIR and Project Approvals

A draft EIR for the project was issued in May 2007 and circulated between May 18, 2007, and July 2, 2007. On July 15, 2008, following public hearings on the project before the planning commission and the City Council, the City Council adopted resolution No. 5612 certifying the final EIR, dated June 2008, and adopting factual findings and a statement of overriding considerations. The final EIR concluded that the project would have significant impacts on traffic, noise, and air quality despite mitigation measures to reduce these impacts.

---

[2] In fairness to the trial court, Wal-Mart did not argue in the trial court that Rialto Citizens did not demonstrate that the Planning and Zoning Law violations or the project description CEQA violation was prejudicial. (Gov. Code, § 65010, subd. (b); Pub. Resources Code, § 21005.) Further, we discern no CEQA error in the EIR's analysis of the project's cumulative impacts on air quality, traffic, and global climate change, or in the City's rejection of the reduced density alternative as infeasible, after painstakingly reviewing and analyzing the EIR and the City's CEQA findings. The trial court had a lot of information to review in a short amount of time, and the parties at times directed it to portions of the EIR and the record which were taken out of context.

Also on July 15, 2008, and as part of the project approvals, the City Council adopted resolution No. 5613 amending the City's general plan; resolutions Nos. 5614 and 5615 amending the Gateway Specific Plan; and ordinance No. 1424 approving the development agreement between the City and Wal-Mart Real Estate Business Trust, Inc. The general and specific plan amendments changed the permitted land use on the project site from office to general commercial, and from office park to retail commercial, respectively.

## IV. ANALYSIS/PUBLIC INTEREST STANDING

■ We first address Wal-Mart's claim that Rialto Citizens lacks standing to bring the present writ petition. Lack of standing is a jurisdictional defect that may be raised at any time, including, as it is here, for the first time on appeal. (*Qualified Patients Assn. v. City of Anaheim* (2010) 187 Cal.App.4th 734, 751 [115 Cal.Rptr.3d 89].)

As we explain, Rialto Citizens has standing under the "public interest exception" to the general rule that a party must be beneficially interested in the issuance of a writ in order to petition for the writ. (*Waste Management of Alameda County, Inc. v. County of Alameda* (2000) 79 Cal.App.4th 1223, 1232–1233 [94 Cal.Rptr.2d 740] (*Waste Management*), disapproved on other grounds in *Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 169–170 [127 Cal.Rptr.3d 710, 254 P.3d 1005] (*Save the Plastic Bag Coalition*).) It is therefore unnecessary to determine whether Rialto Citizens or any of its members was beneficially interested in the issuance of the writ. (Code Civ. Proc., § 1086.)[3]

In its opening trial brief in support of its writ petition filed in January 2009, Rialto Citizens claimed it had standing to bring the petition and had exhausted all available administrative remedies. To support these claims, Rialto Citizens adduced the declaration of Richard Lawrence, the president of Rialto Citizens and Citizens for Responsible Equitable Environmental Development (CREED), both nonprofit corporations. Lawrence averred that, over the previous several years, CREED had advocated to ensure that "big box" development projects met all of the requirements of CEQA and other planning, zoning, and land use laws.

According to Lawrence, around May 31, 2008, CREED began commenting on the project through the Briggs Law Corporation, using the name Rialto Citizens for Responsible Growth. At that time, Rialto Citizens was an unincorporated nonprofit association, and CREED was one of its members.

---

[3] Code of Civil Procedure section 1086 provides, in pertinent part, that a writ of mandate "must be issued upon the verified petition of the party beneficially interested."

The record also includes a letter dated July 1, 2008, to the City Council from the Briggs Law Corporation on behalf of Rialto Citizens, urging the City Council not to approve the project and explaining why the project would violate CEQA, the Planning and Zoning Law, and other land use laws.

As indicated, the City Council certified the EIR and approved the project following a public hearing on July 15, 2008. On August 1, 2008, Rialto Citizens became a nonprofit public benefit corporation, organized to promote "social welfare through advocacy for and education regarding responsible and equitable environmental development."[4] The corporate entity, Rialto Citizens, then filed the present writ petition on August 8, 2008. (Pub. Resources Code, § 21177, subds. (b), (c) [organization formed after approval of a project may maintain CEQA action if a member of that organization objected to the approval of the project prior to the close of the public hearing on the project].)

■ As a general rule, legal standing to petition for a writ of mandate requires the petitioner to have a beneficial interest in the writ's issuance. (*Regency Outdoor Advertising, Inc. v. City of West Hollywood* (2007) 153 Cal.App.4th 825, 829 [63 Cal.Rptr.3d 287]; Code Civ. Proc., § 1086.) A petitioner is beneficially interested if he or she has " 'some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large.' " (*Save the Plastic Bag Coalition, supra*, 52 Cal.4th at p. 165, quoting *Carsten v. Psychology Examining Com.* (1980) 27 Cal.3d 793, 796 [166 Cal.Rptr. 844, 614 P.2d 276].)

■ Beneficially interested parties "are ' "in fact adversely affected by governmental action" ' and have standing in their own right to challenge that action. [Citation.]" (*Save the Plastic Bag Coalition, supra*, 52 Cal.4th at p. 170.) A beneficial interest must be "direct and substantial." (*Id.* at p. 165.) Thus, "the writ must be denied if the petitioner will gain no direct benefit from its issuance and suffer no direct detriment if it is denied." (*Waste Management, supra*, 79 Cal.App.4th at p. 1232.) The beneficial interest requirement applies to ordinary as well as administrative mandate proceedings, including those alleging CEQA violations. (*Waste Management*, at pp. 1232–1233.)

■ A petitioner who is not beneficially interested in a writ may nevertheless have " 'citizen standing' " or "public interest standing" to bring the writ petition under the "public interest exception" to the beneficial interest requirement. (*Save the Plastic Bag Coalition, supra*, 52 Cal.4th at pp. 170, fn. 5,

---

[4] A copy of Rialto Citizens's articles of incorporation is authenticated in and attached to Lawrence's declaration.

166; see *Regency Outdoor Advertising, Inc. v. City of West Hollywood, supra,* 153 Cal.App.4th at p. 832.) The public interest exception "applies where the question is one of public right and the object of the action is to enforce a public duty—in which case it is sufficient that the plaintiff be interested as a citizen in having the laws executed and the public duty enforced. [Citations.]" (*Waste Management, supra,* 79 Cal.App.4th at pp. 1236–1237.) The public interest exception " 'promotes the policy of guaranteeing citizens the opportunity to ensure that no governmental body impairs or defeats the purpose of legislation establishing a public right.' [Citations.]" (*Save the Plastic Bag Coalition, supra,* at p. 166.)

Wal-Mart claims Rialto Citizens lacks public interest standing to challenge the City's actions certifying the EIR and approving the project because it has not shown it meets any of the four criteria formulated by the *Waste Management* court for determining whether a corporate entity has public interest standing. These are (1) whether the corporation has shown a continuing interest in or commitment to the public right being asserted; (2) whether it represents individuals who would be beneficially interested in the action; (3) whether individuals who are beneficially interested would find it difficult or impossible to seek vindication of their own rights; and (4) whether prosecution of the action as a citizen suit by a corporation would conflict with other competing legislative policies. (*Waste Management, supra,* 79 Cal.App.4th at p. 1238.)

In July 2011, after Wal-Mart filed its opening brief on this appeal, the court in *Save the Plastic Bag Coalition* disapproved *Waste Management* "to the extent it held that corporate parties are routinely subject to heightened scrutiny when they assert public interest standing," and accordingly placed a corporation's ability to invoke the public interest exception on equal footing with natural persons. (*Save the Plastic Bag Coalition, supra,* 52 Cal.4th at pp. 169–170, fn. omitted.) The court reasoned that, in the context of a citizen suit, or for purposes of public interest standing, "[t]he term 'citizen' . . . is descriptive, not prescriptive. It reflects an understanding that the action is undertaken to further the public interest and is not limited to the plaintiff's private concerns. Entities that are not technically 'citizens' [(including corporations)] regularly bring citizen suits. [Citations.] Absent compelling policy reasons to the contrary, it would seem that corporate entities should be as free as natural persons to litigate in the public interest. [Citation.]" (*Id.* at p. 168.) The court cautioned, however, that public interest standing is not "freely available to business interests lacking a beneficial interest in the litigation," and no party may proceed with a mandamus petition "as a matter of right" under the public interest exception. (*Id.* at p. 170, fn. 5.) In some cases, " '[t]he policy underlying the exception may be outweighed by competing considerations . . . .' " (*Ibid.*)

On the record before this court, there is no compelling policy reason why Rialto Citizens should not have public interest standing to challenge the City's project approvals on the CEQA and non-CEQA grounds raised in the petition. As the Lawrence declaration shows, Rialto Citizens is a nonprofit public benefit corporation formed for the purpose of promoting "social welfare through advocacy for and education regarding responsible and equitable environmental development." And by its writ petition, Rialto Citizens seeks to enforce the City's public duties to comply with CEQA and the Government Code in considering and approving the project.

In contrast to the present case, *Waste Management* involved a corporate landfill operator whose commercial or competitive interests were deemed an impediment to its public interest standing. (See *Save the Plastic Bag Coalition, supra,* 52 Cal.4th at p. 167; *Waste Management, supra,* 79 Cal.App.4th at p. 1228.) The landfill operator petitioned for a writ of mandate directing that permits issued to one of its competitors be set aside pending CEQA review of the environmental effects of the competitor's operations. The court concluded that the landfill operator lacked a beneficial interest and also lacked public interest standing. (*Waste Management, supra,* at pp. 1235–1237.)

Unlike the corporate landfill operator in *Waste Management*, Rialto Citizens is a nonprofit public benefit corporation, and as such has no commercial or competitive interests to undermine or override its public interest standing. Thus here, it is appropriate to apply the public interest exception.[5]

■ It has long been observed that " 'strict rules of standing that might be appropriate in other contexts have no application where broad and long-term [environmental] effects are involved.' [Citation.]" (*Save the Plastic Bag Coalition, supra,* 52 Cal.4th at p. 170; see *Burrtec Waste Industries, Inc. v. City of Colton* (2002) 97 Cal.App.4th 1133, 1138–1139 [119 Cal.Rptr.2d 410] [Fourth Dist., Div. Two]; *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1198 [22 Cal.Rptr.3d 203] [noting

---

[5] On June 3, 2011, the date it filed its opening brief on appeal, Wal-Mart requested that this court take judicial notice of the signed "self-authenticating" deposition transcript of Theresa Quiroz, "the [p]erson[] [m]ost [k]nowledgeable of . . . Rialto Citizens . . . ." (See Evid. Code, §§ 452, subd. (h), 459; Code Civ. Proc., § 909.) Wal-Mart took the deposition in December 2010, after Rialto Citizens filed a motion for attorney fees under the private attorney general statute. (Code Civ. Proc., § 1021.5.) By taking the deposition, Wal-Mart sought to discover whether the writ had been sought primarily for the personal benefit of any of Rialto Citizens's members, or other persons. (See *Save Open Space Santa Monica Mountains v. Superior Court* (2000) 84 Cal.App.4th 235, 246–250 [100 Cal.Rptr.2d 725] [allowing limited discovery of private interests of party opposing Code Civ. Proc., § 1021.5 motion].) We reserved ruling on the request for judicial notice with this appeal. Rialto Citizens does not oppose the request. We grant the request, and note that nothing in the deposition indicates that Rialto Citizens or any of its members has a personal, commercial, or other interest in the litigation that would constitute a compelling reason not to apply the public interest exception.

CEQA's "liberal standing" requirement].) The City's certification of the EIR and its other actions approving the project will have broad and long-term environmental effects, and the City has a public duty to comply with the Planning and Zoning Law and CEQA in considering and approving the project. In sum, based on the record before us, Rialto Citizens has public interest standing to challenge the City's actions certifying the EIR and approving the project—even if neither Rialto Citizens nor any of its members have a direct and substantial beneficial interest in the issuance of the writ.[6]

## V. ANALYSIS/PLANNING AND ZONING LAW VIOLATIONS

A. *The Notice of the Public Hearing Before the City Council Was Defective, but There Was No Showing That the Defective Notice Was Prejudicial (§§ 65094, 65010, subd. (b))*

Following a May 28, 2008, public hearing on the project, the planning commission certified the EIR and recommended that the City Council approve and adopt the general and specific plan amendments and the development agreement for the project. On June 21, 2008, the City published a revised notice in the San Bernardino County Sun newspaper, stating that on July 1, 2008, the City Council would hold a public hearing to consider certifying the EIR, adopting the plan amendments, and adopting the development agreement. At the close of the July 1 hearing, the City Council continued the hearing to July 15. On July 15, the City Council certified the EIR, adopted the general and specific plan amendments, and adopted the development agreement.

In the trial court, Rialto Citizens claimed and the trial court agreed that the notice of the July 1 public hearing before the City Council violated the Planning and Zoning Law because it did not indicate whether the planning commission had recommended that the City Council approve the plan amendments or the development agreement. (§ 65094.) On this appeal, Wal-Mart contends, as it did in the trial court, that the notice was not required

---

[6] Lawrence averred that Rialto Citizens's members included "a natural person who resides in the City of Rialto near the intersection of Foothill Boulevard and Riverside Avenue, less than three miles from the [p]roject site." Rialto Citizens argues that this unidentified person had a beneficial interest in the writ because "three miles is close enough to suffer the traffic and noise impacts of the [p]roject." (Cf. *Braude v. City of Los Angeles* (1990) 226 Cal.App.3d 83, 88–89 [276 Cal.Rptr. 256] [petitioner who traveled on the Harbor Freeway with thousands of other people could not show he had an interest not held in common with the public and therefore lacked a beneficial interest in the writ, when the project would have only an incremental effect on traffic in the downtown Los Angeles area].) Again, however, it is unnecessary for us to determine whether Rialto Citizens or any of its members has a beneficial interest in the writ, given that Rialto Citizens has public interest standing.

to include the planning commission's recommendations. Instead, Wal-Mart argues that the notice complied with section 65094 because it included the date, time, and place of the hearing and further stated, among other things, that the approval of the plan amendments and the development agreement would be considered at the July 1 public hearing before the City Council.

We agree that the notice was required to include the planning commission's recommendations. But Rialto Citizens made no attempt to show in the trial court, and the trial court did not find, that the defective notice was prejudicial, caused substantial injury to anyone, or that a different result was probable absent the defect. (§ 65010, subd. (b).) Thus as a matter of law, the plan amendments and the development agreement were erroneously invalidated based on the defective notice.

■ Under the Planning and Zoning Law (§ 65000 et seq.), notices of public hearings on general and specific plan amendments and development agreements must be given in accordance with section 65090. (§§ 65355, 65453, subd. (a), 65867.) Under section 65090, the notice must include "the information specified in Section 65094." (§ 65090, subd. (b).) Section 65094, in turn, defines a notice of public hearing as one that includes, among other things, "*a general explanation of the matter to be considered*" at the hearing. (Italics added.) The interpretation of a statute and its application to undisputed facts are questions of law subject to de novo review. (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 722 [39 Cal.Rptr.3d 189].)

The question here is whether the notice of the July 1 public hearing before the City Council was required to include the planning commission's recommendations to adopt the plan amendments and development agreement as part of "a general explanation of the matter to be considered" at the public hearing. (§ 65094.) *Environmental Defense Project of Sierra County v. County of Sierra* (2008) 158 Cal.App.4th 877 [70 Cal.Rptr.3d 474] (*Environmental Defense Project*), an action for declaratory relief, is on point and persuasive.

At issue in *Environmental Defense Project* was whether the County of Sierra's so-called streamlined zoning process—in which the county routinely gave notices of hearings before its board of supervisors on proposed zoning ordinances and amendments (§ 65856) *before* its planning agency made its recommendations to the board—violated the Planning and Zoning Law. (*Environmental Defense Project, supra,* 158 Cal.App.4th at p. 881.) The court concluded that the notices of hearing had to be given *after* the board received the planning commission's recommendations, not before. (*Id.* at pp. 881, 888–889.) Importantly, the court *also* concluded that the notices

"must include the planning commission's recommendation as part of the 'general explanation of the matter to be considered' (§ 65094)." (*Id.* at p. 881.)

Wal-Mart maintains that the second part of the court's holding in *Environmental Defense Project* is dictum. Indeed, as Wal-Mart points out, it was not necessary for the court to determine that the planning commission's recommendations had to be included in the notices of hearing before the board of supervisors in order to determine the question presented, which was whether the notices, as a matter of course, had to be given *after* the board of supervisors received the planning commission's recommendations. Here, the trial court acknowledged that the second part of the court's holding "might be technically classified as *dicta*," but found the court's reasoning on the point persuasive and applicable to the present notice issue. So do we.

The court in *Environmental Defense Project* reasoned that section 65094 is properly read in conjunction with the state's policy and the Legislature's intent, expressed in section 65033, that the public "be involved in the planning process and be given 'the opportunity to respond to clearly defined alternative objectives, policies, and actions.' (§ 65033.)" (*Environmental Defense Project, supra*, 158 Cal.App.4th at p. 891.) After considering section 65094 in the context of the statutory framework of which it is a part, the court concluded: "[T]here can be little doubt that the purpose of notice in cases such as this one is to inform the public of the legislative body's hearing so they will have an opportunity to respond to the planning commission's recommendation and protect any interests they may have before the legislative body approves, modifies, or disapproves that recommendation. If notice could be given before the planning commission made its recommendation *and, therefore, without inclusion of what that recommendation was*, the purpose behind the notice provision would be ill served, as the notice would not inform the public to what 'clearly defined alternative objectives, policies, and actions' they would be responding." (*Environmental Defense Project, supra*, at pp. 889, 891–892, italics added.)

The record before the court supported its conclusions. The Sierra County Planning Department recommended approving a tentative parcel map and a zoning ordinance amendment at a January 27, 2005, meeting, and made changes to the project during that meeting. (*Environmental Defense Project, supra*, 158 Cal.App.4th at p. 892.) Notice of a February 1 hearing before the board of supervisors was given on January 20, *before* the planning department made its January 27 recommendations. Additionally, the planning department's project changes and recommendations were not transmitted to the board until late during the day on January 28, giving the public only one full business day to prepare comments on the changes and recommendations

before the February 1 hearing before the board. (*Ibid.*) At the board hearing, the plaintiff commented that, due to the county's streamlined zoning procedure, she did not have sufficient time to " 'conduct a meaningful review of the project recommended for approval by the [planning commission],' " and this " 'detract[ed] from the public's participation in the process.' " (*Ibid.*)

Unlike the notice in *Environmental Defense Project*, which was given before the planning department made its recommendations to the board of supervisors, the notice of the July 1 public hearing before the City Council was given on June 21, several weeks after the planning commission made its recommendations on May 28. But like the notice in *Environmental Defense Project*, the notice of the July 1 hearing did not include the planning commission's recommendations on the matters to be considered at the hearing, even though the recommendations were made well before the notice was given.

■ As *Environmental Defense Project* explains, section 65033 recognizes "the importance of public participation at every level of the planning process," and expresses "the policy of the state and the intent of the Legislature" that the public "be afforded the opportunity to respond to clearly defined alternative objectives, policies, and actions." (§ 65033; see *Environmental Defense Project, supra*, 158 Cal.App.4th at p. 891.) In light of the policy of full public participation expressed in section 65033, the planning commission's recommendations were a necessary part of "a general explanation of the matter to be considered" (§ 65094) at the July 1 hearing, and as such were required to be included in the notice of that hearing. (See *Environmental Defense Project, supra*, at p. 889 [courts must not consider statutory language in isolation but look to the entire substance of the statute, harmonizing its parts and considering its clauses or sections in the context of the statutory framework as a whole].)

■ Nevertheless, the City Council's actions approving the plan amendments and the development agreement were erroneously invalidated based solely on the defective notice of public hearing. Under the Planning and Zoning Law, a court may not set aside the actions of a legislative body based on an error or omission in a notice of public hearing, unless the court finds the error was prejudicial, the complaining party suffered substantial injury, and a different result was probable had the error not occurred. (§ 65010, subd. (b).) Neither prejudice, substantial injury, nor the probability of a different result may be presumed based on a showing of error alone. (*Ibid.*)[7]

---

[7] The full text of section 65010, subdivision (b) states: "No action, inaction, or recommendation by any public agency or its legislative body or any of its administrative agencies or officials on any matter subject to this title shall be held invalid or set aside by any court on the ground of the improper admission or rejection of evidence or by reason of any error,

In the trial court, Rialto Citizens made no attempt to show, and the trial court did not find, that the defective notice of hearing resulted in prejudice or substantial injury to anyone, or that a different result was probable had the notice included the planning commission's recommendations. (§ 65010, subd. (b).) For that matter, none of the parties informed the trial court that it had to find prejudice, substantial injury, and that a different result was probable absent the defective notice, before it could invalidate the plan amendments and the development agreement based on the defective notice. (*Ibid.*) Instead, the parties focused on whether *Environmental Defense Project* was controlling on the question of whether the notice was defective, but the case did not involve the application of section 65010, subdivision (b).

*Environmental Defense Project* involved an action for declaratory relief, and as the court there pointed out, section 65010, subdivision (b) does not apply to actions for declaratory relief. (*Environmental Defense Project, supra*, 158 Cal.App.4th at p. 887.) In affirming the judgment of the trial court granting declaratory relief, the court did not set aside the board's actions approving the tentative parcel map and zoning amendment. (*Id.* at pp. 883, 894.) Indeed, the plaintiff was not seeking to set aside the board's actions, but a judicial declaration that the county's "streamlined zoning process," violated the Planning and Zoning Law. (158 Cal.App.4th at p. 882.) In short, *Environmental Defense Project* did not involve the application of section 65010, subdivision (b).

Rialto Citizens maintains Wal-Mart has forfeited its right to complain that Rialto Citizens did not demonstrate prejudice, substantial injury, or a probability of a different result based on the defective notice of hearing, because Wal-Mart did not raise these failure-of-proof issues in the trial court. Not so.

■ As the party seeking to set aside the City's actions approving the plan amendments and the development agreement based on the defective notice, Rialto Citizens had the burden of demonstrating prejudice, substantial injury, and the probability of a different result under section 65010, subdivision (b), but failed to do so. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 819–820 [85 Cal.Rptr.2d 696, 977 P.2d 693] [party contesting administrative action, which is presumed correct, has burden of producing evidence and proving action was incorrect]; Evid. Code, §§ 110, 115, 664.) Instead, Rialto Citizens relied on the defective notice alone as invalidating the plan amendment and development agreement approvals. But the City's approval of the

irregularity, informality, neglect, or omission (hereafter, error) as to any matter pertaining to petitions, applications, notices, findings, records, hearings, reports, recommendations, appeals, or any matters of procedure subject to this title, unless the court finds that the error was prejudicial and that the party complaining or appealing suffered substantial injury from that error and that a different result would have been probable if the error had not occurred. There shall be no presumption that error is prejudicial or that injury was done if the error is shown."

plan amendments and the development agreement were erroneously set aside based on the defective notice alone, without a showing that the defective notice resulted in prejudice and substantial injury, and that a different result was probable had the notice not been defective. (§ 65010, subd. (b).)

Lastly, Rialto Citizens argues there is evidence in the record "that would support the trial court's opinion that the [defective] notice inhibited full public participation." We disagree. But even if the record arguably contains any such evidence, the court's conclusion that the defective notice "inhibited full public participation" is unsupported by the necessary, underlying factual findings of prejudice, substantial injury, and the probability of a different result absent the error. (§ 65010, subd. (b).) Nor is it the province of this court to make such factual findings, particularly when, as here, undisputed evidence does not support such findings. (See Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2011) ¶ 1:12, p. 1-2 (rev. # 1, 2009).)

■■■ Section 65010, formerly section 65801, is a "curative statute" enacted by the Legislature for the purpose of "terminating recurrence of judicial decisions which had invalidated local zoning proceedings for technical procedural omissions. [Citations.]" (*City of Sausalito v. County of Marin* (1970) 12 Cal.App.3d 550, 557–558 [90 Cal.Rptr. 843].) On this record, the failure of the notice of the public hearing before the City Council to include the planning commission's recommendations on the matters to be considered at the hearing was a harmless omission.

B. *The City Council Erroneously Approved the Development Agreement Without Finding Its Provisions Were Consistent with the General Plan and the Gateway Specific Plan (§ 65867.5), but There Was No Showing That the Omitted Finding Was Prejudicial (§ 65010, subd. (b))*

Under the Planning and Zoning Law, "[a] development agreement is a legislative act that shall be approved by ordinance . . ." and "shall not be approved unless the legislative body finds that the provisions of the agreement are consistent with the general plan and any applicable specific plan." (§ 65867.5, subds. (a), (b).) In the trial court, Rialto Citizens claimed, and the trial court agreed, that the City improperly approved the project without finding that the development agreement was consistent with the general plan and the Gateway Specific Plan, and on this basis the trial court invalidated the ordinance approving the development agreement.

On this appeal, Wal-Mart claims that substantial evidence in the record shows that the City did in fact find that the development agreement was consistent with the general and specific plans. We disagree. The record nowhere indicates that the City made this finding.

To be sure, at its May 28, 2008, hearing, the *planning commission* approved and adopted resolution No. 8-25, finding that "the provisions of the proposed Development Agreement are consistent with the General Plan and Specific Plan . . . ." Then, on July 15, 2008, the City Council adopted resolution No. 5612, certifying the EIR as complying with CEQA. The City's CEQA findings are attached to resolution No. 5612 as exhibit A. On the same date, the City adopted the general and specific plan amendments and the ordinance approving the development agreement. But none of these documents include a finding that the provisions of the development agreement were consistent with the general plan and the Gateway Specific Plan. Nor do any of these documents adopt the planning commission's resolution No. 8-25, or its consistency finding.

Wal-Mart maintains that the City's resolution No. 5612 and CEQA findings effectively include a finding that the development agreement was consistent with the general and specific plans. Not so. Though the caption or title of resolution No. 5612 refers to the plan *amendments* and the development agreement, the resolution focuses solely on the EIR and certifies the EIR, and does not mention the development agreement or the plan amendments outside of its caption. The CEQA findings state that *the project* would be consistent with "the land use plan and relevant policies of the [g]eneral [p]lan," and that *the project* "would be in compliance with the applicable goals and policies of the Gateway Specific Plan." But neither the EIR nor the CEQA findings define the project as including the development agreement. Thus, neither resolution No. 5612 nor the CEQA findings include a finding that the development agreement was consistent with the general plan and the Gateway Specific Plan.[8]

Nevertheless, the trial court erroneously invalidated the ordinance approving the development agreement based solely on the City's failure to make the consistency finding. (§ 65867.5, subd. (b).) In order to invalidate the ordinance, the court had to find that the *absence* of the consistency finding resulted in prejudice and substantial injury and that a different result (e.g., disapproval of the ordinance) was probable absent the omitted finding. (§ 65010, subd. (b).) The court did not make this finding.

Indeed, Rialto Citizens did not claim in the trial court, and does not claim on this appeal, that any of the provisions of the development agreement were inconsistent with the general and specific plans, as these plans were amended

---

[8] Wal-Mart does not claim that the City's resolutions Nos. 5613, 5614, and 5615, amending the general and specific plans and adopting the ordinance approving the development agreement, respectively, include a finding that the development agreement was consistent with the general and specific plans. Copies of these resolutions and the ordinance are not included in the record, though the record indicates that the City adopted them on July 15, 2008.

to accommodate the project. By all appearances, the City's failure to make the section 65867.5 consistency finding, particularly after the planning commission made the finding, was an oversight and did not result in prejudice or substantial injury to anyone. (§ 65010, subd. (b).) Further, there is no indication that a different result was probable had the City made the consistency finding. (*Ibid.*)

## VI. ANALYSIS/CEQA ISSUES

We next consider Wal-Mart's claims concerning the sufficiency of the EIR as an informational document, and the City Council's finding, in approving the project, that the reduced density alternative was infeasible. We find no prejudicial abuse of discretion on the part of the City Council, either in its certification of the EIR as complying with CEQA or in its rejection, at the project approval stage, of the reduced density alternative as infeasible.

### A. *Standard of Review*

In reviewing a petition challenging the legality of a lead agency's actions under CEQA, our role is the same as the trial court's. We review the agency's actions, not the trial court's decision, and our inquiry extends "only to whether there was a prejudicial abuse of discretion" on the part of the agency. (Pub. Resources Code, § 21168.5; see *Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316, 326–327 [118 Cal.Rptr.3d 182] [Fourth Dist., Div. Two].) An abuse of discretion is established if the agency has not proceeded in a manner required by law or if its factual determinations are not supported by substantial evidence. (Pub. Resources Code, § 21168.5; *Vineyard Area Citizens For Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426 [53 Cal.Rptr.3d 821, 150 P.3d 709].) For purposes of CEQA, substantial evidence "means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Cal. Code Regs., tit. 14, § 15384, subd. (a).)[9]

Questions concerning the proper interpretation or application of the requirements of CEQA are matters of law. (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 118 [104 Cal.Rptr.2d 326].) CEQA requires that an EIR include detailed information concerning, among other things, the significant environmental effects of the

---

[9] All references to the Guidelines are to the state CEQA guidelines. (Cal. Code Regs., tit. 14, § 15000 et seq.) The Guidelines are binding on all public agencies in California in implementing the provisions of CEQA. (Guidelines, §§ 15000–15001.)

project under consideration. (Pub. Resources Code, §§ 21100, 21100.1.) When the informational requirements of CEQA are not met but the agency nevertheless certifies the EIR as meeting them, the agency fails to proceed in a manner required by law and abuses its discretion. (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors, supra*, at pp. 117–118.) " 'The EIR is the heart of CEQA,' and the integrity of the process is dependent on the adequacy of the EIR. [Citations.]" (*Ibid.*)

In reviewing the lead agency's actions under CEQA, we do not " ' " 'pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document.' " [Citation.] We may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. "Our limited function is consistent with the principle that 'The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations.' " [Citations.] We may not, in sum, substitute our judgment for that of the people and their local representatives. We can and must, however, scrupulously enforce all legislatively mandated CEQA requirements.' " (*Native Sun/Lyon Communities v. City of Escondido* (1993) 15 Cal.App.4th 892, 905 [19 Cal.Rptr.2d 344].)

■ The Legislature intended CEQA " 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 [253 Cal.Rptr. 426, 764 P.2d 278].) "The EIR is the primary means of achieving the Legislature's considered declaration that it is the policy of this state to 'take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state.' [Citation.] . . . An EIR is an 'environmental "alarm bell" ' whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return.' [Citations.] The EIR is also intended 'to demonstrate to an apprehensive citizenry that the agency has, in fact, analyzed and considered the ecological implications of its action.' [Citations.] Because the EIR must be certified or rejected by public officials, it is a document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees. [Citations.] The EIR process protects not only the environment but also informed self-government." (*Id.* at p. 392.)

■ An EIR is presumed legally adequate, however (*Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 740

[22 Cal.Rptr.2d 618]; Pub. Resources Code, § 21167.3), and the agency's certification of an EIR as complying with the requirements of CEQA is presumed correct (*Cherry Valley Pass Acres & Neighbors v. City of Beaumont, supra,* 190 Cal.App.4th at p. 327). Persons challenging the EIR therefore bear the burden of proving it is legally inadequate, or that insufficient evidence supports one or more of its conclusions. (*Ibid.*)

"'[T]he ultimate decision of whether to approve a project, be that decision right or wrong, is a nullity if based upon an EIR that does not provide the decision-makers, and the public, with the information about the project that is required by CEQA.' [Citation.] The error is prejudicial 'if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process.' [Citation.]" (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 721–722 [32 Cal.Rptr.2d 704].)

Still, "'[a]bsolute perfection is not required,'" and the level of analysis in an EIR "is subject to a rule of reason." (*Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d at pp. 406–407.) The absence of information in an EIR does not per se constitute a prejudicial abuse of discretion. (Pub. Resources Code, § 21005.) Instead, "'[a] prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process. [Citation.]' [Citation.]" (*Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners, supra,* 18 Cal.App.4th at p. 748.)

B. *The Project Description Was Incomplete Because It Did Not Identify the Development Agreement as an Approval Required to Implement the Project, But This Omission Did Not Preclude Informed Decisionmaking Concerning the Project*

In the trial court, Rialto Citizens claimed, and the trial court agreed, that the project description in the EIR was incomplete and therefore inadequate because it did not include the development agreement in a listing of "permits and *other approvals required to implement the project.*" (Guidelines, § 15124, subd. (d)(1)(B), italics added.) Wal-Mart claims the project description was not required to include the development agreement because the agreement was not a permit or approval required to implement the project. Wal-Mart is mistaken, but as we explain, the failure to identify the development agreement as part of the project did not preclude informed public participation and decisionmaking concerning the project, because the approval of the development agreement was duly noticed and considered at the July 1 and July 15,

2008, public hearings on the project, along with the certification of the EIR and the other project approvals.

▆▆▆ CEQA applies to "discretionary projects proposed to be carried out or approved by public agencies." (Pub. Resources Code, § 21080, subd. (a).) The term "project" is broadly defined as meaning "the whole of an action, which has a potential for resulting in . . . a direct physical change in the environment," directly or ultimately (Guidelines, § 15378, subd. (a)), and refers to "the activity which is being approved and which may be subject to several discretionary approvals," but "does not mean each separate governmental approval" (*id.*, subd. (c)). The Guidelines require the project description to include "[a] statement briefly describing the intended uses of the EIR," and this statement must include, "to the extent that the information is known to the lead agency," "[*a*] *list of permits and other approvals required to implement the project.*" (Guidelines, § 15124, subd. (d)(1)(B), italics added.)

As Wal-Mart points out, the purpose of a development agreement is to "vest the previously obtained approvals" or give assurance to the applicant that upon approval of the project it may proceed with the project in accordance with existing policies, rules and regulations. (§ 65864, subd. (b).) We disagree, however, with Wal-Mart's argument that a development agreement "does not, itself, constitute a permit or approval, much less a *required* permit or approval."

▆▆▆ A development agreement is a legislative act that must be approved by ordinance. (Gov. Code, § 65867.5, subd. (a).) As such, it qualifies as an approval. Further, the City's approval of the development agreement was "required to implement the project" (Guidelines, § 15124, subd. (d)(1)(B)), even if the approval was required by Wal-Mart, rather than by the City, to assure Wal-Mart that it could implement the project based on other project approvals. The record also indicates that the City knew the development agreement would be required when the EIR was prepared. (*Id.*, subd. (d)(1).) Thus the development agreement was erroneously excluded from the list of permits and other approvals required to implement the project—even though the agreement did not identify any permits or approvals not listed in the EIR.

▆▆▆ Nevertheless, " '[n]oncompliance with CEQA's information disclosure requirements is not per se reversible; prejudice must be shown. [Citation.]' [Citation.]" (*Sunnyvale West Neighborhood Assn. v. City of Sunnyvale City Council* (2010) 190 Cal.App.4th 1351, 1384–1385 [119 Cal.Rptr.3d 481], fn. omitted.) Based on the record, it is clear that the City's failure to include the development agreement in the project description was not prejudicial. The approval of the development agreement was duly noticed and

considered at the public hearings on the project before the City Council, along with the certification of the EIR and other project approvals. The City Council approved the development agreement by ordinance. (§ 65867.5.) Thus, the omission of the development agreement from the project description in the EIR did not undermine informed public participation or decision-making concerning the approval of the development agreement or the project as a whole. (Pub. Resources Code, § 21005; *Schenck v. County of Sonoma* (2011) 198 Cal.App.4th 949, 959–960 [130 Cal.Rptr.3d 527]; *Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners, supra,* 18 Cal.App.4th at p. 748.) Accordingly, the City did not prejudicially abuse its discretion in omitting the development in the EIR's project description.

*Native Sun/Lyon Communities v. City of Escondido, supra,* 15 Cal.App.4th 892 is instructive. There, a development agreement was included in the project description, but the contents of the agreement were not discussed in the EIR. (*Id.* at p. 909.) The court concluded, however, that it was unnecessary to discuss the development agreement in the EIR, because its inclusion in the project description "alerted persons interested in [the agreement] to its relevance in the decisionmaking process." (*Ibid.*)

Similarly, the inclusion of the development agreement in the notice of the public hearing on the project before the City Council alerted interested persons to its relevance in the decisionmaking process for the project. It was therefore unnecessary to discuss the development agreement in the EIR. Indeed, the provisions of the agreement were not germane to an analysis of the project's potential environmental impacts. (See Guidelines, § 15124 [project description should not supply extensive detail beyond that needed for evaluation and review of environmental impacts]; Pub. Resources Code, § 21083.1 [Guidelines are not to be interpreted to impose procedural or substantive requirements beyond those explicitly stated in the Guidelines].)

Rialto Citizens argues that the City prejudicially erred in failing to discuss the development agreement in the EIR, because the development agreement provided that, upon certain conditions, Wal-Mart was to be reimbursed for traffic and storm runoff improvements it made outside the "footprint" of the project site. We disagree. The reimbursements were not germane to the environmental impacts of the project. Additionally, Rialto Citizens has not shown that the development agreement required Wal-Mart to make any improvements that were not discussed in the EIR. Thus it was unnecessary to discuss the development agreement in the EIR.

C. *The EIR Adequately Analyzed the Project's Cumulative Impacts on Traffic*

 Under CEQA, " '[c]umulative impacts' refer to two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts." (Guidelines, § 15355.) The Guidelines define "[t]he cumulative impact from several projects" as "the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonably foreseeable probable future projects." (*Id.*, subd. (b).)

 An EIR is required to discuss the cumulative impacts of a project "when the project's incremental effect is cumulatively considerable." (Guidelines, § 15130, subd. (a).) The discussion "should be guided by the standards of practicality and reasonableness," but several elements are deemed "necessary to an adequate discussion of significant cumulative impacts . . . ." (*Id.*, subd. (b).) These necessary elements include *either* "(A) A list of past, present, and probable future projects producing related or cumulative impacts, including, if necessary, those projects outside the control of the agency, or [¶] (B) A summary of projections contained in an adopted [general] plan, or related planning document, . . . [or in a] prior environmental document" which has been adopted or certified, which described or evaluated regional or areawide conditions contributing to the cumulative impact. "Any such [planning] document shall be referenced and made available to the public at a location specified by the lead agency." (*Id.*, subd. (b)(1)(A)–(B).)

The trial court ruled that the EIR inadequately analyzed the project's cumulative impacts on traffic because the analysis was not based on "a list of anticipated projects," nor did it "work off of a prior document that assembled such a list." (See Guidelines, § 15130, subd. (b)(1)(A).) The court pointed out that "rather than work off of a list of projects the cumulative traffic analysis was done by projecting traffic based on 'updated socioeconomic data and the extension of the State Route 210 freeway to its current terminus.' . . . This would appear to be insufficient under the Guideline[s], . . . which requires either a list of anticipated projects or working off of a prior document that assembled such a list. Neither was done in the present case, and the general projections described in the EIR thus leave anyone examining the EIR unable to question what projects were included (or excluded) and thus unable to properly question the sufficiency of the analysis." (Fn. omitted.)

As we explain, the trial court misapprehended the basis of the EIR's analysis of the project's cumulative impacts on traffic. Although the analysis was not based on "[a] list of past, present, and probable future projects

producing related or cumulative impacts" on traffic conditions (Guidelines, § 15130, subd. (b)(1)(A)), it complied with subdivision (b)(1)(B) of section 15130 of the Guidelines because it was based on "[a] summary of projections contained in and . . . [a] prior environmental document" which has been adopted or certified, which described or evaluated regional or areawide conditions contributing to the cumulative impact.

The EIR analyzed the project's cumulative impacts on traffic conditions using the same database and computer modeling system used in developing the San Bernardino County Congestion Management Program (CMP), an environmental document previously adopted by the San Bernardino County Associated Governments (SANBAG). (See § 65089.) Under the Planning and Zoning Law (§ 65000 et seq.), a "congestion management program" must be "developed, adopted, and updated biennially . . . for every county that includes an urbanized area," and must include "every city and the county" (§ 65089, subd. (a)). A CMP must include (1) a "program to analyze the impacts of land use decisions made by local jurisdictions on regional transportation systems," and (2) "a uniform data base on traffic impacts for use in a countywide transportation computer model . . . that will be used by local jurisdictions to determine the quantitative impacts of development on the circulation system . . . ." (§ 65089, subds. (b)(4), (c).)

In 1992, SANBAG adopted a CMP for San Bernardino County and updated the CMP biennially, including in 2005 before the draft EIR was prepared in May 2007.[10] SANBAG developed the CMP, together with a "uniform data base on traffic impacts for use in a countywide transportation computer model," in consultation with a technical advisory committee composed of planning and engineering staff from, among others, SANBAG member cities and the Southern California Association of Governments (SCAG). (§ 65089, subd. (c).)[11] SCAG is the regional agency responsible for

---

[10] We grant Wal-Mart's request that we take judicial notice of the preface and introduction sections of the December 2007 update to the CMP for San Bernardino County. (Evid. Code, § 452, subds. (b), (c), (h).) These sections show that a CMP for San Bernardino County was adopted by SANBAG in 1992 and updated in 1993, 1995, 1997, 1999, 2001, 2003, 2005, and 2007.

[11] Section 65089, subdivision (c) states: "The agency, in consultation with the regional agency, cities, and the county, shall develop a uniform data base on traffic impacts for use in a countywide transportation computer model and shall approve transportation computer models of specific areas within the county that will be used by local jurisdictions to determine the quantitative impacts of development on the circulation system that are based on the countywide model and standardized modeling assumptions and conventions. The computer models shall be consistent with the modeling methodology adopted by the regional planning agency. The data bases used in the models shall be consistent with the data bases used by the regional planning agency. Where the regional agency has jurisdiction over two or more counties, the data bases used by the agency shall be consistent with the data bases used by the regional agency."

preparing and adopting a regional transportation plan that includes San Bernardino County. (§ 65080.)

The EIR's projections of the project's cumulative impacts on traffic was based on "the Rialto Wal-Mart Supercenter Draft Traffic Study (Traffic Study)," dated March 26, 2007, prepared by Meyer, Mohaddes Associates (MMA), and attached to the EIR as appendix No. 15.3.[12] The EIR explains that because the CMP requires "an analysis of existing conditions, project opening year conditions (Year 2008) and long-term horizon year conditions (currently 2030)," the Traffic Study (Rialto Wal-Mart Supercenter Draft Traffic Study) analyzed traffic conditions (1) in 2005, (2) in 2008 with and without project conditions, and (3) in 2030 with and without project conditions. Importantly, these projected traffic conditions were calculated using the same computer model used in the CMP and maintained by SCAG, namely, the "Comprehensive Transportation Plan (CTP) travel demand model."[13]

Rialto Citizens argues that "using the standards" or the same computer model used in the CMP to project countywide traffic conditions "is not the same as relying on a 'summary of projections' " contained in the CMP. (See Guidelines, § 15130, subd. (b)(1)(B).) We disagree. Effectively, the Comprehensive Transportation Plan (CTP) travel demand model included "a summary of projections" of traffic conditions in San Bernardino County. SANBAG, the agency responsible for developing, adopting, and updating the CMP, was required to "develop a uniform data base on traffic impacts for use in a countywide transportation computer model . . . ." (§ 65089, subds. (a), (c).)

Moreover, the EIR shows that this uniform data base included updated data on traffic conditions in San Bernardino County. The EIR explains that year 2030 traffic volumes were projected using a "refined version" of the CTP travel demand model, "developed by MMA in consultation with SCAG and Caltrans for use in the analysis of the proposed Duncan Canyon Road interchange on Interstate 15 . . . in the City of Fontana . . . . This version of the model was used because it incorporates *additional network detail in the Cities of Rialto and Fontana, as well as a representation of existing conditions, including updated socioeconomic data and the extension of the State Route 210 freeway to its current terminus.* The 2030 network of the CTP model was modified by the addition of a new traffic analysis zone to represent the proposed project. Therefore, the 2030 model run represents

---

[12] The March 2007 traffic study is not included in the record on appeal; instead, the record includes an earlier draft traffic study for the project prepared by MMA in December 2006.

[13] The scope of the Traffic Study was determined in accordance with "[c]ity traffic study guidelines" and the "analysis methodologies" of the CMP. The study area was determined "using data from the [CTP] travel demand model."

'with project' conditions." (Italics added.) Year 2030 conditions without project conditions were projected "by subtracting project turning movements at each intersection." Thus the uniform data base used to project the project's cumulative impact on traffic conditions necessarily included "[a] summary of projections" of areawide traffic conditions used in the CMP, a previously adopted environmental document. (Guidelines, § 15130, subd. (b)(1)(B).)

D. *The EIR Adequately Explained the Geographic Scope of Its Analysis of the Project's Cumulative Impacts on Air Quality*

In the trial court, Rialto Citizens claimed that the EIR's analysis of the project's cumulative impacts on air quality was inadequate because it did not include "a substantial contributor to air pollution in the area: namely, the BNSF Railway yard," and, in excluding the railway yard, the EIR understated the severity of the cumulative impact. The trial court ruled that the analysis was inadequate because the EIR did not explain why it used "a 5 mile limit . . . for the air quality cumulative analysis." The Guidelines provide that "[l]ead agencies should define the geographic scope of the area affected by the cumulative effect and *provide a reasonable explanation for the geographic limitation used.*" (Guidelines, § 15130, subd. (b)(3), italics added.)

Wal-Mart claims the EIR *did not use* a five-mile limit in analyzing cumulative air quality impact, and that its analysis of the impact was adequate. Wal-Mart is correct on both points. As we explain, the EIR concluded that the project would have a significant cumulative impact on air quality based solely on the emissions from the project, and its analysis of this cumulative impact was adequate.

Table No. 4-1 of the EIR consists of a "cumulative projects list." The EIR explains that the cumulative projects list "identifies related projects and other possible development in the area determined as having the potential to interact with the proposed project to the extent that a significant cumulative effect may occur. . . . The resulting related projects primarily include those determined to be at least indirectly capable of interacting with the [project]."

There are a total of 72 projects on the cumulative projects list; 65 are within three miles of the project site and the other seven are between three and five miles from the project site. The list includes an 82,400-square-foot locomotive repair facility, a 49,050-square-foot lumber yard office and retail store, a 250,000-square-foot pallet repair and sales yard, warehouses, industrial buildings, office buildings, retail centers, multiple single-family residences, and apartment buildings. The BSNF railway yard is not on the list. A "Cumulative Projects Map" shows the location of each of the 72 projects in relation to the project site, and includes circles indicating the three- and five-mile radii from the project site.

In concluding that the EIR limited the geographic scope of the analysis to projects located within a five-mile radius of the project, the trial court confused that analysis with the EIR's separate "market impact analysis." The EIR explains: "For purposes of the *Market Impact Analysis*, the market area boundaries were defined in terms of two radii: [¶] Primary Market Area (PMA): a 3-mile radius around the proposed project site; and [¶] Secondary Market Area (SMA): a 5-mile radius . . . . [¶] The PMA corresponds to the typical trade area for a neighborhood shopping center (i.e., a center anchored by a major supermarket). The combined market areas (a 5-mile radius) correspond to the typical trade area for 'big box' or community-scale shopping facilities. . . ." (Fn. omitted.)

The trial court acknowledged that the three- and five-mile boundaries "were drawn for the market impact analysis because these are the typical trade areas for neighborhood shopping areas and 'big box' facilities," but then concluded: "This makes for a reasonable explanation for a 5 mile geographic limit being provided for the market impact cumulative analysis, but it does not constitute an explanation for why a 5 mile limit should be used for the air quality cumulative analysis." Similarly, Rialto Citizens argues the cumulative projects list is "arbitrary" because "[g]eographic limits on market impacts have very little, if anything, to do with the appropriate geographic limitation for air quality impacts."

To be sure, the EIR *indicates* that it analyzed the project's cumulative impacts on air quality based on the cumulative projects list in table No. 4-1, because it expressly states that it analyzed the project's cumulative impacts "in consideration of the projects identified in Table 4-1 . . . with the exception of *traffic and noise assessments*." This was plainly not the case, however. Indeed, the analysis shows that it was not based on the cumulative projects list at all, but on the project's emissions alone. Indeed, the EIR concluded that the project would have a significant *cumulative* impact on air quality because *the project itself* would "generate emissions that exceed the thresholds of significance recommended by the SCAQMD for ROG, $NO_x$, and CO," and there were no feasible mitigation measures, other than those already adopted, to reduce these impacts.[14]

---

[14] The EIR explains that the South Coast Air Quality Management District (SCAQMCD) and California Area Resources Board (CARB) "monitor the project area's local ambient air quality. The CARB monitors ambient air quality at approximately 250 air monitoring stations across the state. Air quality monitoring stations usually measure pollutant concentrations ten feet aboveground level; therefore, air quality is often referred to in terms of ground-level concentrations. Each monitoring station is located within a Source Receptor Area (SRA). The communities within an SRA are expected to have similar climatology and ambient air pollutant concentrations. The proposed project is in the City of Rialto, which is located in SRA 34 . . . ."

We review an agency's decision to include information in a cumulative impacts analysis for an abuse of discretion. (*City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 906 [98 Cal.Rptr.3d 137].) " 'The primary determination is whether it was reasonable and practical to include the projects *and whether, without their inclusion, the severity and significance of the cumulative impacts were reflected adequately.*' [Citation.]" (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 525 [80 Cal.Rptr.3d 28, 187 P.3d 888], italics added.)

Substantial evidence shows that it was neither reasonable nor practical to analyze the project's cumulative impact on air quality by, for example, quantifying its emissions in relation to other nearby projects. The EIR explains: "The SCAQMD neither recommends quantified analyses of cumulative construction or operational emissions, nor does it provide separate methodologies or thresholds of significance to be used to assess cumulative construction or operational impacts. *Instead, the SCAQMD recommends that a project's potential contribution to cumulative impacts should be assessed using the same significance criteria as those for project specific impacts.* Therefore, individual development projects that generate construction-related or operational emissions that exceed the SCAQMD recommended daily thresholds for project-specific impacts would also cause a cumulative considerable increase in emissions for those pollutants for which the Basin is nonattainment."[15] (Fn. omitted.)

 In view of the SCAQMD's recommendations, the EIR reasonably analyzed the project's cumulative impact on air quality based on the project's emissions alone. In discussing a cumulative impact, " '[t]he relevant issue to be addressed in an EIR is not the relative amount of impact resulting from a proposed project when compared to existing environmental problems caused by past projects, but rather whether the additional impact associated with the project *should be considered significant in light of the serious nature of existing problems.*' [Citation.]" (*City of Long Beach v. Los Angeles Unified School Dist., supra,* 176 Cal.App.4th at pp. 905–906, italics omitted & added.) The EIR addressed whether the project's additional impact on air quality should be considered cumulatively significant in light of the existing air quality problem, and concluded that it was.

 An EIR's discussion of a project's cumulative impacts should "be guided by the standards of practicality and reasonableness, and . . . focus on

---

[15] On our own motion, we take judicial notice that the SCAQMD is the agency responsible for attaining state and federal clean air standards in the South Coast Air Basin, which includes significant portions of Los Angeles, Riverside, and San Bernardino Counties and all of Orange County (see <http://www.aqmd.gov/aqmd/index.html#mission> [as of July 31, 2012]). (Evid. Code, § 452, subd. (h).)

the cumulative impact to which the identified other projects contribute . . . ." (Guidelines, § 15130, subd. (b).) " '[A] good faith and reasonable disclosure of such impacts is sufficient.' " (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1403 [133 Cal.Rptr.2d 718].) The cumulative air quality impacts analysis met these standards. In a separate section of the EIR addressing the project's individual impact on air quality, the EIR explains that "[t]he project's greatest contributor to pollutant emissions would be from vehicle trips," and "[d]espite implementation of mitigation measures and project design features, impacts associated with long-term air quality operations would remain significant and unavoidable." More specifically, the EIR explains that because the project would generate approximately 17,317 additional daily car trips, it would generate $O_3$ and $PM_{10}$ emissions in excess of the SCAQMD recommended daily thresholds and standards for significance, even after incorporating mitigation measures.

E. *The EIR Adequately Addressed the Project's Cumulative Impacts on Greenhouse Gas Emissions and Global Climate Change, and Properly Concluded the Impacts Were Too Speculative to Determine*

The trial court concluded that the EIR was defective in two respects concerning its analysis and statements regarding the project's potential cumulative impacts on greenhouse gases and global climate change. Specifically, the court ruled: "The EIR improperly dismisses the cumulative impacts of Greenhouse Gas Emissions and Climate Change Impacts because of an inability to analyze the individual impacts of the Project," and "[t]he EIR in its body finds a significant and unavoidable impact as to greenhouse gasses and global climate change yet fails to separately list this impact among the significant impacts of the Project."

Wal-Mart claims both rulings are in error. We agree. As we explain, the EIR adequately addressed the project's cumulative impact on greenhouse gas emissions and global climate change, and properly concluded the impact was too speculative to determine. Thus the EIR did not, in fact, conclude that the project would have a significant cumulative impact on global climate change, and there was therefore no need to list the impact in the EIR's "stand alone" list of significant and unavoidable impacts. We first address the "stand alone" listing issue, then we explain that the EIR adequately analyzed the project's cumulative impact on global climate change.

1. *The "Stand Alone" Listing Issue*

An EIR is required to list, in a separate "stand alone" section, each of the project's significant and unavoidable environmental impacts, including its cumulative impacts. (Pub. Resources Code, § 21100, subd. (b)(2)(A).) In

the "stand alone" section of the EIR listing the project's significant impacts, there is no mention of any significant impacts on greenhouse gases or global climate change. In a section titled "global climate change," the EIR explains that the project's impacts on greenhouse gas emissions and global climate change were too speculative to evaluate, and on this basis concluded that "a conclusion on the significance of the environmental impact of climate change cannot be reached." Following this statement, the EIR quotes section 15145 of the Guidelines, which states: "If, after thorough investigation, a lead agency finds that a particular impact is too speculative for evaluation, the agency should note its conclusion and terminate discussion of the impact." On the following page of the draft EIR, immediately following the conclusion that the global climate change impact was too speculative to evaluate and the quotation of Guidelines section 15145, the EIR states: "Mitigation Measures: No mitigation measures are recommended. [¶] Level of Significance: Significant and Unavoidable Impact." Plainly, this conclusion was inconsistent with the EIR's statement that the project's cumulative impact on greenhouse gases and global climate change was too speculative to evaluate.

Based on the EIR's apparent indication that the project would have a significant and unavoidable cumulative impact on global climate change, Rialto Citizens claimed, and the trial court agreed, that the EIR was defective for failing to include in its "stand alone section" listing all significant impacts, that the project would have a significant impact on greenhouse gas emissions and global climate change. The court acknowledged, however, that "[t]he analysis of the global climate change issues seem[s] to be leading to the conclusion that no levels of significance could be determined, which makes the conclusion that there would be a significant and unavoidable impact appear to be unjustified."

Indeed, the EIR did not in fact conclude that the project's cumulative impacts on greenhouse gases and global climate change were significant and unavoidable. Pages 5.3-39 through 5.3-43 of the draft EIR show that the "significant and unavoidable impact" finding to which the trial court referred concerned the project's cumulative impact on air quality, not its cumulative impact on greenhouse gases and global climate change. Pages 5.3-39 through 5.3-43 include the draft EIR's discussion of the project's cumulative impacts on air quality *and* its cumulative impacts on global climate change.

Under the section of the draft EIR titled "global climate change," which appears on pages 5.3-40 through 5.3-42, the EIR discusses the project's cumulative impacts on greenhouse gases and global climate change. This discussion immediately follows the EIR's discussion of the project's cumulative impacts on air quality. At the top of page 5.3-43, following the end of global climate change discussion, the EIR states: "Level of Significance:

Significant and Unavoidable Impact." In context, this statement refers back to the EIR's discussion of the project's cumulative impacts on air quality, which concludes on page 5.3-40. At the conclusion of the cumulative air quality impacts discussion, the EIR states that cumulative impacts on air quality would be significant and unavoidable.[16] Also, immediately after the "Significant and Unavoidable" statement on page 5.3-43, the EIR lists four separate impacts on air quality that would remain significant and unavoidable.

By contrast, in the section titled "global climate change," the EIR explains that: "Based on the current scientific literature, it would be speculative to determine whether the contribution of any particular project or plans to greenhouse gas emissions and climate changes is significant. Based on an investigation of [the project's] compliance with local air quality thresholds, future long-term operational impacts, and Wal-Mart's commitment to increasing the company's environmental sustainability goals and policies . . . the project would still have the potential to result in impacts associated with greenhouse gas emissions and global climate change. However, there is significant uncertainty involved in making predictions of the extent [to] which the project operations have on greenhouse gas emissions and global climate change. *Therefore, a conclusion on the significance of the environmental impact of climate change cannot be reached. . . .*" (Italics added.)

In view of the EIR's detailed explanation that the project's cumulative impacts on greenhouse gases and global climate change was too speculative to evaluate, and its immediately preceding conclusion that the project's cumulative impact on air quality would be significant and unavoidable, it is clear that the "significant and unavoidable impact" finding on page 5.3-41 of the EIR referred to the project's cumulative impact on air quality, not its too-speculative-to-determine cumulative impact on greenhouse gases and global climate change. This explains why the EIR did not list greenhouse gases and global climate change among the project's significant and unavoidable impacts in its "stand alone" sections listing these impacts. (Pub. Resources Code, § 21100, subd. (b)(3).) Given the EIR's contrary conclusion, there was no need to do so.

### 2. *The EIR's Analysis of the Issue*

Wal-Mart claims that substantial evidence supports the EIR's conclusion that the project's cumulative impact on greenhouse gases and, by extension,

---

[16] On page 5.3-40, within its larger discussion of cumulative air quality impacts, the EIR states, in part, that: "[T]he proposed project would generate emissions that exceed the thresholds of significance recommended by the SCAQMD . . . [and b]ecause the Basin is nonattainment for ozone . . . the proposed project would make a cumulative considerable contribution to ozone emissions. Therefore, cumulative impacts associated with the proposed project would be significant and unavoidable."

global climate change, was too speculative to determine. We agree that the City did not abuse its discretion in concluding that the impact was too speculative to determine, given the absence of established legal or regulatory guidelines, or accepted methodologies, to gauge the cumulative impact.

 An EIR's analysis of a project's cumulative impact should focus on the project's contribution to the impact in combination with other projects (Guidelines, §§ 15130, 15355) and consider "whether the additional impact associated with the project should be considered significant in light of the serious nature of existing problems." (*City of Long Beach v. Los Angeles Unified School Dist., supra,* 176 Cal.App.4th at pp. 905–906, italics omitted.) Climate change is by definition a cumulative impact, because it does not result from any single project but from "emissions generated globally over many decades," and its effects are "global rather than local." (2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2011) §§ 20.83, 20.84, pp. 1033–1035 (rev. 3/12); see Guidelines, § 15355 [" '[c]umulative impacts' refer to two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts"].)

 "CEQA gives lead agencies discretion to design an EIR . . ." (2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra,* § 20.81D, p. 1030 (rev. 3/12)) and the agency is not required to conduct every recommended test or perform all requested research or analysis (Guidelines, § 15204, subd. (a)). "If, after thorough investigation, a lead agency finds that a particular impact is too speculative for evaluation, the agency should note its conclusion and terminate discussion of the impact." (Guidelines, § 15145.) An EIR is required to evaluate a particular environmental impact only to the extent it is "reasonably feasible" to do so. (Guidelines, § 15151; 2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra,* § 20.81D, p. 1030 (rev. 3/12).) More generally, "the adequacy of an EIR is determined in terms of what is reasonably feasible, in light of factors such as the magnitude of the project at issue, the severity of its likely environmental impacts, and the geographic scope of the project." (Guidelines, § 15204, subd. (a).)

The trial court ruled that the EIR's analysis of the project's cumulative impacts on greenhouse gases and, by extension, global climate change, was "insufficient because it fails to address the cumulative impacts merely because a level of significance could not be determined for the Project's individual impact. . . ." The court reasoned: "[I]t should be obviously impermissible to decline to analyze the *cumulative* impacts because it cannot be determined whether or not the *individual* impacts of the Project are significant; there is no showing in the EIR that levels of significance cannot be determined for the cumulative impact on greenhouse gasses."

The trial court was apparently referring to the EIR's statement that: "Based on the current scientific literature, it would be speculative to determine whether the contribution *of any particular project or plans* to greenhouse gas emissions and climate changes is significant. Based on an investigation of [the project's] compliance with local air quality thresholds, future long-term operational impacts, and Wal-Mart's commitment to increasing the company's environmental sustainability goals and policies . . . *the project would still have. the potential to result in impacts associated with greenhouse gas emissions and global climate change.* However, there is significant uncertainty involved in making predictions of the extent [to] which the project operations have on greenhouse gas emissions and global climate change. . . ." (Italics added.)

We disagree with the trial court's premise that it was impermissible not to analyze the project's *cumulative* impact on greenhouse gases and global climate change because it was too speculative to determine whether the project's *individual* impact was significant. As noted, global climate change is necessarily and by definition a cumulative impact. (2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, § 20.83, p. 1033 (rev. 3/12).) Thus, the question presented in the EIR was whether the project's individual greenhouse gas emissions were significant in light of the existing global warming problem. (See *City of Long Beach v. Los Angeles Unified School Dist., supra*, 176 Cal.App.4th at pp. 905–906.)

The EIR states: "It is nearly universally recognized that the Earth is warming and that emissions of greenhouse gases from human activities contribute to global climate change." "California is a substantial contributor of global greenhouse gasses emitting over 400 million tons of [carbon dioxide] $CO_2$ a year. . . . [¶] . . . Greenhouse gases are global in their effect, which is to increase the earth's ability to absorb heat in the atmosphere. Because the primary greenhouse gases have a long lifetime in the atmosphere, accumulate over time, and are generally well mixed, their impact on the atmosphere is mostly independent of the point of emission."

The EIR acknowledges that on June 1, 2005, Governor Arnold Schwarzenegger signed Executive Order No. S-3-05, which established several "reduction targets" for greenhouse gas emissions for the State of California: By 2010, to 2000 levels; by 2020, to 1990 levels; and by 2050, to 80 percent below 1990 levels. Thereafter, the "Climate Action Team" (CAT), comprised of representatives from the California Environmental Protection Agency, CARB, and other state agencies, was convened. The CAT prepared the Climate Action Team Report to Governor Schwarzenegger and the California Legislature (Dec. 2010), which included, among other things, recommended strategies "to reduce climate change risks." Several of these

CAT strategies "directly appl[ied] to the . . . project" and were listed in table No. 5.3-14. These strategies included reducing vehicle emissions and improving vehicle fleet efficiency; recycling and reducing waste; and adopting energy efficient technologies, including "green building" technologies. Wal-Mart was adopting these strategies, and expected to reduce greenhouse gases "at all existing and proposed stores around the world by over 20 percent" over the next three to 10 years.

The EIR also acknowledges that the Legislature passed Assembly Bill No. 32 (2005–2006 Reg. Sess.) (the California Global Warming Solutions Act of 2006 or Assembly Bill 32) (Health & Saf. Code, §§ 38500–38599) on August 31, 2006. Assembly Bill 32 implements one of the "reduction targets" of Executive Order No. S-3-05 by requiring the State of California to reduce its global warming emissions to 1990 levels by 2020. (Health & Saf. Code, § 38550.) According to the EIR, this reduction was to be "accomplished through an enforceable statewide cap on global warming emissions that would be phased in starting in 2012." (See Health & Saf. Code, §§ 38562, subd. (a) [requiring CARB to "adopt greenhouse gas emission limits and emission reduction measures by regulation . . . to become operative beginning on January 1, 2012"], 38560.5, subd. (a) [requiring CARB to publish, by June 30, 2007, "a list of discrete early action greenhouse gas emission reduction measures that can be implemented prior to the measures and limits adopted pursuant to [Health & Saf. Code, §] 38562."].)

Notwithstanding Assembly Bill 32's greenhouse gas emission limits and reduction measures, the EIR observed that Assembly Bill 32 "primarily provides a timeframe for establishing plans, policies, and studies to address global climate change," but did not "provide thresholds or methodologies for analyzing a project's impacts" on global climate change. The EIR also noted that while "several" unspecified "studies" were available regarding "the overall impacts associated [with] global climate change, the conclusions and predictions vary with each report." On this basis, the EIR concluded that the project's impacts on greenhouse gas emissions and global climate change were too speculative to determine. (Guidelines, § 15145.)

Indeed, when the EIR was certified in July 2008, there were no legal or regulatory standards for determining whether a given project's greenhouse gas emissions should be considered cumulatively significant. (See 2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, §§ 20.81–20.81A, pp. 1021–1026 (rev. 3/12).) As stated in the EIR, Assembly Bill 32 did not "provide thresholds or methodologies for analyzing a project's impacts" on global climate change. And, though the 2006 legislation acknowledged that "[g]lobal warming poses a serious threat to the economic well-being, public health, natural resources, and the environment of California"

(Health & Saf. Code, § 38501, subd. (a)), it did not "reference CEQA or provide [any] guidance regarding CEQA analysis of [greenhouse gas] emissions" on global climate change (2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, § 20.81, p. 1021 (rev. 3/12)).[17] In 2010, new Guidelines were adopted which provide lead agencies with critical guidance in calculating and determining the significance of greenhouse gas emissions (Guidelines, § 15064.4) and in formulating feasible mitigation measures to reduce their impacts (Guidelines, § 15126.4, subd. (c)). But none of these Guidelines were in effect when the EIR was certified in July 2008; thus they were not available to guide the City in preparing the EIR.[18]

---

[17] In June 2007, the Association of Environmental Professionals issued a white paper titled Alternative Approaches to Analyzing Greenhouse Gas Emissions and Global Climate Change in CEQA Documents (June 29, 2007). (2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, § 20.81A, p. 1026 (rev. 3/12).) This white paper set forth alternative approaches to preparing qualitative and quantitative analyses of greenhouse gas emissions in CEQA documents. (*Ibid.*) In January 2008, the California Air Pollution Control Officers Association issued a white paper titled CEQA and Climate Change: Evaluating and Addressing Greenhouse Gas Emissions from Projects Subject to the California Environmental Quality Act. (*Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 91 [108 Cal.Rptr.3d 478].) This white paper discussed alternative methodologies for determining whether a project's greenhouse gas emissions would be significant or less than significant. Both white papers were prepared by private organizations and, as such, neither established any legal or regulatory standards for evaluating greenhouse gas emissions in CEQA documents. (2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, § 20.81A, p. 1026 (rev. 3/12).)

[18] Section 15064.4 of the Guidelines is titled "Determining the Significance of Impacts from Greenhouse Gas Emissions" and states: "The determination of the significance of greenhouse gas emissions calls for a careful judgment by the lead agency consistent with the provisions in [Guidelines] section 15064. A lead agency should make a good-faith effort, based to the extent possible on scientific and factual data, to describe, calculate or estimate the amount of greenhouse gas emissions resulting from a project." (Guidelines, § 15064.4, subd. (a).) The Guidelines also provide that "[a] lead agency shall have discretion to determine, in the context of a particular project, whether to: [¶] (1) Use a model or methodology to quantify greenhouse gas emissions resulting from a project, and which model or methodology to use . . . provided it supports its decision with substantial evidence . . . and/or [¶] (2) Rely on a qualitative analysis or performance based standards." (*Ibid.*) The Guidelines also state that a lead agency "should consider" three factors, "among others," "when assessing" the significance of impacts from greenhouse gas emissions on the environment: "(1) The extent to which the project may increase or reduce greenhouse gas emissions as compared to the existing environmental setting; [¶] (2) Whether the project emissions exceed a threshold of significance that the lead agency determines applies to the project[; and] [¶] (3) The extent to which the project complies with regulations or requirements adopted to implement a statewide, regional, or local plan for the reduction or mitigation of greenhouse gas emissions. Such requirements must be adopted by the relevant public agency through a public review process and must reduce or mitigate the project's incremental contribution of greenhouse gas emissions. If there is substantial evidence that the possible effects of a particular project are still cumulatively considerable notwithstanding compliance with the adopted regulations or requirements, an EIR must be prepared for the project." (*Id.*, subd. (b).)

Given the absence of legal or regulatory standards or accepted methodologies for gauging the project's cumulative impact on global climate change at the time the EIR was certified in July 2008, the City reasonably concluded that the impact was too speculative to determine. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1137–1138 [26 Cal.Rptr.2d 231, 864 P.2d 502] [lead agency not required to analyze cumulative effect of project's toxic emissions with those of other anticipated projects in the absence of accepted methodologies or standards by which to quantify all of the emissions]; *Alliance of Small Emitters/Metal Industry v. South Coast Air Quality Management Dist.* (1997) 60 Cal.App.4th 55, 67 [70 Cal.Rptr.2d 54] [future impacts of air pollution regulatory program too speculative to determine because future technology unknown]; cf. *Communities for a Better Environment v. City of Richmond, supra,* 184 Cal.App.4th at pp. 89–95 [EIR required to analyze and adopt mitigation measures to reduce project's contributions to greenhouse gas emissions once EIR concluded the project would have a significant impact on greenhouse gas emissions].)

To be sure, the absence of a "single methodology" that would provide a "precise" or " 'universally accepted' " quantification of a particular impact does not excuse the lead agency from "do[ing] the necessary work to educate itself about the methodologies that are available." (*Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs.* (2001) 91 Cal.App.4th 1344, 1370 [111 Cal.Rptr.2d 598].) Here, however, the City did the necessary work to educate itself about the methodologies that were available. The EIR acknowledges that "several studies are available regarding the overall impacts associated [with] global climate change," but observes that "the conclusions and predications vary with each report." The City did not decline to gauge the project's cumulative impact on greenhouse gases and global climate change merely because there was no single, universally accepted methodology for gauging the impact.

F. *The Mitigation Measures to Reduce Biological Impacts Were Sufficient*

The trial court concluded that the EIR improperly deferred mitigation measures to reduce the project's potential impacts on five "special status" plant species (the San Diego ambrosia, Plummer's mariposa lily, smooth tarplant, Robinson's pepper-grass, and rayless ragwort) and three special status wildlife species (the San Bernardino and Stephens' kangaroo rats, and the western burrowing owl). Each of these species had a potential to occur on the project site.

Wal-Mart claims the mitigation measures to reduce impacts on these potentially occurring species were sufficiently definite and did not constitute

improperly deferred mitigation measures. (Guidelines, § 15126.4, subd. (a)(1)(B).) We agree. The mitigation measures incorporated specific performance criteria, and as such were not so open-ended that they allowed potential impacts on the species to remain significant.

### 1. *Overview*

The EIR describes the project site "primarily as a fallow agricultural field" that is regularly cleared of vegetation, with the remaining vegetation consisting of "ruderal (weedy) species . . . ." The site was used for agricultural purposes for over 60 years.

On July 2, 2004, and November 8, 2006, biologists surveyed the site, recorded all wildlife and plants species observed on the site, and evaluated the site for its potential to support special status plant and wildlife species.

The EIR defines "special status" plant and wildlife species as species "afforded special status and/or recognition by Federal and State resource agencies" including the United States Fish and Wildlife Service (USFWS) and California's Department of Fish and Game (CDFG), or the California Native Plant Society (CNPS), a private organization.

No special status wildlife or plant species were found during the 2004 and 2006 surveys, but the EIR concluded that five special status plant species (the San Diego ambrosia, Plummer's mariposa lily, smooth tarplant, Robinson's pepper-grass, and rayless ragwort) and three special status wildlife species (the San Bernardino and Stephens' kangaroo rats, and the western burrowing owl) each had a "potential" to occur on the project site.

The five special status plant species having the potential to occur on the project site, including the San Diego ambrosia, were each considered "rare, threatened, or endangered" by the CNPS. The San Diego ambrosia and the San Bernardino and Stephens' kangaroo rats were also identified as federally endangered species. The burrowing owl was identified as a California "Species of Special Concern," an "informal designation used by the CDFG for some declining wildlife species . . . ." The designation does not provide legal protection, but signifies that the species is recognized as having special status by the CDFG.

The EIR required that mitigation measures be undertaken, prior to the issuance of a grading permit, for the special status plant and wildlife species having the potential to occur on the project site. With the implementation of these measures, the EIR concluded that impacts to the species would be less than significant.

## 2. *Mitigation for the Five Special Status Plant Species*

A "qualified botanist" is to conduct surveys for each of the special status plant species, and the results are to be provided to the City. If fewer than 20 individuals of any of the five plant species are found, no further action will be required, but if 20 or more are found, a qualified botanist is to conduct a plant salvage and transportation plan through the applicant. The plan is to be submitted to the City "prior to site grubbing/grading for review and comment," and is to "identify the program for transplanting the individuals into a receiver site located onsite in permanent open space." The receiver site or "mitigation site" is to be protected by fencing and signage, and maintained for a period of three years. Additionally, "[i]f the performance criteria adopted for the project (to be outlined in the plan, but shall be no less than 80-percent establishment of the individuals) has not been met by the end of this three-year period, then the maintenance and monitoring period will be extended to five years to facilitate plant establishment. The project applicant shall be responsible for the preparation and implementation of the plan."

The EIR also stipulates that if the surveys discover any state-listed threatened or endangered species, then "a 2080 Incidental Take Permit may be required from the CDFG." And if the surveys discover any federally-listed threatened or endangered species, then "the project would require consultation with the USFWS to determine the permitting requirements." The permitting process shall include preparation of "plant salvage and transportation plan to avoid, relocate or minimize impacts on these species. This plan shall be submitted to and approved by the USFWS and CDFG, as required."

## 3. *Mitigation for the San Bernardino and Stephens' Kangaroo Rats*

In order to mitigate impacts on the two federally endangered rat species, the EIR requires a qualified mammalogist to conduct a habitat assessment prior to the issuance of a grading permit and determine whether trapping efforts are necessary. If habitats are found during the habitat assessment, "trapping sessions would be conducted per USFWS protocol." If either species is found, the applicant is required to "consult with the USFWS and/or City of Rialto to determine the appropriate off-site mitigation, which requires that mitigation/compensation for the loss of the kangaroo rats be approved through Section 10(a) consultation pursuant to the [federal Endangered Species Act of 1973 (16 U.S.C. § 1531 et seq.)], as well as specific measures, including, but not limited to, avoidance, minimization and purchase of suitable off-site habitat, as well as monitoring and funding for the maintenance of the site."

### 4. *Mitigation for the Burrowing Owl*

The EIR describes the burrowing owl as "a small owl that often nests in the abandoned burrows of the California ground squirrel, which were observed on the project site. Burrowing owls are known to use both fallow and active agricultural fields for foraging and nesting. Because the majority of the project site consists of fallow agricultural land, there is potential for the burrowing owl to occur on the project site."

Prior to grading, a qualified biologist is to survey the site to "identify suitable burrow(s) and the location(s) of occupied burrow(s)." Though the project site is in San Bernardino County, the EIR requires the biologist to "generally follow" the "Burrowing Owl Survey Instructions for the Western Riverside Multiple Species Habitat Conservation Plan Area" (MSHCP) (County of Riverside 2006). The USFWS and the CDFG have "officially approved" the protocol provided in the survey instructions.

Following the burrow survey, four additional surveys that "focus on owls" are to be conducted during the burrowing owl breeding season (Mar. 1–Aug. 31). The survey results were to be submitted to "the City of Rialto and/or CDFG." If a burrowing owl is not found on the site, no further mitigation will be required. But if a burrowing owl is observed during the surveys, "the . . . [a]pplicant would be required to consult with the [l]ead [a]gency to determine appropriate mitigation, based on conditions at the project site."

### 5. *Applicable Legal Principles*

The Guidelines state: "Formulation of mitigation measures should not be deferred until some future time. However, measures may specify performance standards which would mitigate the significant effect of the project and which may be accomplished in more than one specified way." (Guidelines, § 15126.4, subd. (a)(1)(B).)

■ Thus, when, for practical reasons, mitigation measures cannot be fully formulated at the time of project approval, the lead agency may commit itself to devising them at a later time, provided the measures are required to "*satisfy specific performance criteria articulated at the time of project approval.*" (*Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1028–1029 [280 Cal.Rptr. 478], italics added.) In other words, "[d]eferral of the specifics of mitigation is permissible where the local entity commits itself to mitigation and lists the alternatives to be considered, analyzed and possibly incorporated in the mitigation plan. [Citation.] On the other hand, an agency goes too far when it simply requires a project applicant to obtain a biological report and then comply with any recommendations that may be

made in the report. [Citation.]" *(Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1275 [15 Cal.Rptr.3d 176].)

In sum, "it is sufficient to articulate specific performance criteria and make further [project] approvals contingent on finding a way to meet them." *(Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 793 [32 Cal.Rptr.3d 177].) Essentially, the rule prohibiting deferred mitigation prohibits loose or open-ended performance criteria. Deferred mitigation measures must ensure that the applicant will be required to find some way to reduce impacts to less than significant levels. If the measures are loose or open-ended, such that they afford the applicant a means of avoiding mitigation during project implementation, it would be unreasonable to conclude that implementing the measures *will* reduce impacts to less than significant levels.

### 6. *Analysis*

The trial court concluded that the EIR's mitigation measures to reduce impacts on the potentially occurring special status plant and wildlife species were insufficient because "the City has not even required the applicant to comply with the recommendations made by the USFWS or CDFG; the EIR merely requires the project applicant to 'consult' with these entities." Specifically regarding the San Bernardino and Stephens' kangaroo rats, the court ruled that "viewing the mitigation measure as a whole," the applicant "could fulfill its duties by consulting with the public agencies and then deciding that an appropriate mitigation measure would be throwing the trapped animals into the ocean. Once again the mitigation measure just leaves too much unresolved and is insufficient."

Respectfully, the trial court misinterpreted the "consultation" requirement. The EIR explains that "[i]mpacts to [federally endangered] species resulting from the implementation of a project would require the responsible agency to consult the USFWS. Formal consultations must take place with the USFWS pursuant to Section 10 of the Endangered Species Act, with the USFWS then making a determination as to the extent of impact to a particular species. If the USFWS determines that impacts to a species would likely occur, alternatives and measures to avoid or reduce impacts must be identified."

Thus the "formal consultation" requirement does not allow the applicant or the City to unilaterally decide what to do with any federally endangered species found on the project site, after conferring with the USFWS. Instead, the applicant must consult with "the USFWS and/or City of Rialto," the City must in turn consult with the USFWS "to determine the appropriate off-site mitigation, which requires that mitigation/compensation for the loss of the

kangaroo rats be approved through Section 10(a) consultation pursuant to the [federal Endangered Species Act of 1973]." Either the applicant or the City must also consult with the USFWS to determine other mitigation measures, "including, but not limited to, avoidance, minimization and purchase of suitable off-site habitat, as well as monitoring and funding for the mainte-nance of the site."

These measures were sufficiently definite to ensure that potential impacts to the San Bernardino and Stephens' kangaroo rats will be mitigated. (*Defend the Bay v. City of Irvine, supra*, 119 Cal.App.4th at p. 1276 [no improper deferral of mitigation where developer required to consult with the USFWS and CDFG, obtain permits, and adopt seven itemized avoidance measures in coordination with the agencies].)

The measures required to reduce potential impacts on the federally pro-tected San Diego ambrosia were likewise sufficient. These required "consul-tation with the USFWS to determine the permitting requirements," which were to "include preparation of plant salvage and transportation plan to avoid, relocate or minimize impacts on these species." The plan was to be "submit-ted to and approved by the USFWS and CDFG, as required." (See *Defend the Bay v. City of Irvine, supra*, 119 Cal.App.4th at p. 1276.)

At a minimum, the agency-approved plan to preserve the San Diego ambrosia is to comport with the plan described in the EIR, which requires the applicant to maintain each of the five special status plant species in an open space area on the project site for three to five years in the event 20 or more individual plants of any of the species is found on the site prior to grading. Though this plan does not require state or federal approval as applied to the four other special status plant species, it ensures that the applicant will reduce impacts on these species to less than significant levels.[19]

Finally, the trial court ruled that the measures to reduce potential impacts on the burrowing owl were insufficient because they only required consulta-tion with the City to determine the appropriate mitigation. This disregards the specifics of the burrowing owl mitigation plan. The applicant is to conduct an initial survey to identify "suitable burrow(s) and the location(s) of occupied

---

[19] In ruling that the measures to reduce impacts on the five special status plant species were improperly deferred, the trial court relied in part on the provisions of the draft EIR, which were significantly changed in the final EIR. The trial court ruled: "The applicant is not required to adopt a mitigation plan . . . that would accomplish any particular goals. The mitigation measures adopted by the EIR state that '[t]he appropriate mitigation shall be determined on a case-by-case basis, considering factors such as quality of habitat on the project site, size of plant populations located, and status of the species. . . .' This is so broad as to be essentially meaningless . . . ." These provisions were deleted from the final EIR and replaced with the three-to-five-year plan to preserve the plant species on the project site.

burrow(s)," generally following USFWS and CDFG "officially approved" protocol. Next, four additional surveys that "focus on owls" must be conducted during the breeding season. If any burrowing owls are observed during any of the surveys, the applicant must consult with the City "to determine the appropriate mitigation, based on conditions at the project site." Though the EIR did not specify exactly what will be done if any burrowing owls are found, it commits the applicant and the City to find a way to render any impact insignificant before a grading permit is issued. (Cf. *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 669–671 [57 Cal.Rptr.3d 663] [disapproving mitigation plan to reduce impacts on burrowing owls where no reason given for deferral of offsite land management plan for burrowing owl preserve and no specific criteria or standard of performance committed to in EIR].)

G. *The City Properly Rejected the Reduced Density Alternative as Infeasible*

The proposed project evaluated in the draft EIR consisted of a 284,000-square-foot commercial center, anchored by a 250,000-square-foot Wal-Mart Supercenter with four commercial outparcels. The draft EIR also evaluated a smaller scale alternative, the "reduced density alternative" (RDA), which excluded the four commercial outparcels but retained the 250,000-square-foot Wal-Mart Supercenter. In the final EIR, the project was revised to reduce the size of the Wal-Mart Supercenter to just under 200,000 square feet, but the revised project included the four commercial outparcels. Thus, the overall square footage of the revised project, which the City ultimately approved, was 230,000 square feet—smaller than the RDA.

In its CEQA findings, the City found that the revised project, like the original project, would still have significant impacts on traffic, noise, and air quality, despite the reduced size of the Wal-Mart Supercenter. Also in the CEQA findings, the City rejected the RDA as "infeasible" for two reasons: (1) it would not fulfill all of the project's objectives and (2) it was not "environmental[ly] superior [to the revised project] with regard to those impacts that are considered to be a significant Project impact."

Specifically, the City found that "[b]y not developing the outparcel sites, the stated objective to '[c]reate an opportunity for synergistic mix of retail and restaurant tenants in the City of Rialto providing residents with additional shopping and eating options,' would not be achieved. The remaining Project objectives would be fulfilled by the [RDA], but to a lesser degree than the proposed Project. Furthermore, [the RDA] is not environmental[ly] superior with regard to those impacts that are considered to be a significant Project impact. Accordingly, this Council finds the [RDA] infeasible and rejects the [RDA]."

The trial court ruled that insufficient evidence supports the City's finding that the RDA was not environmentally superior to the project. In so concluding, the trial court referred to the *draft EIR's* findings that the project would have significant impacts on traffic and noise and that the RDA was environmentally superior because it would have fewer impacts on traffic and noise than the *original project*. On this basis, the trial court concluded that the City's finding that the RDA was "not environmental[ly] superior" was "contrary to the factual findings in the [draft] EIR."[20]

Wal-Mart claims that substantial evidence supports the City's finding rejecting the RDA as infeasible. We agree.

■ A lead agency may not approve a project with significant environmental impacts unless it first finds that alternatives and mitigation measures to reduce the impacts are infeasible based on " '[s]pecific economic, legal, social, technological or other considerations.' " (*California Native Plant Society v. City of Santa Cruz, supra*, 177 Cal.App.4th at p. 982; see Pub. Resources Code, § 21081, subds. (a)(3), (b); Guidelines, §§ 15043, 15091, 15093.) " 'Feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social and technological factors." (Guidelines, § 15364.) Feasibility findings must be supported by substantial evidence. (*Cherry Valley Pass Acres & Neighbors v. City of Beaumont, supra*, 190 Cal.App.4th at p. 357.)

■ At the project approval stage, "the agency considers whether '[s]pecific economic, legal, social, technological, or other considerations . . . make infeasible the mitigation measures or alternatives identified in the environmental impact report.' ([Pub. Resources Code,] § 21081, subd. (a)(3).) Broader considerations of policy thus come into play when the decisionmaking body is considering actual feasibility than when the EIR preparer is assessing potential feasibility of the alternatives." (*California Native Plant Society v. City of Santa Cruz, supra*, 177 Cal.App.4th at p. 1000.)

---

[20] The trial court indicated that the City's finding rejecting the RDA as infeasible was made in the City's statement of overriding considerations, but the finding was in fact appropriately made in the City's CEQA findings, not in its statement of overriding considerations. (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 981–982 [99 Cal.Rptr.3d 572] [distinguishing lead agency's evaluation of an EIR's feasibility findings from the lead agency's statement of overriding considerations approving a project *despite* its unavoidable impacts]; *Cherry Valley Pass Acres & Neighbors v. City of Beaumont, supra*, 190 Cal.App.4th at pp. 356–357 [feasibility findings " ' "focus on the feasibility of specific proposed alternatives and mitigation measures," ' " while overriding considerations are " ' "larger, more general reasons for approving the project" ' " despite its unavoidable impacts]; Pub. Resources Code, § 21081.)

Thus, for example, a lead agency may reject an alternative as infeasible because it cannot meet project objectives, as long as the finding is supported by substantial evidence in the record. (*City of Del Mar v. City of San Diego* (1982) 133 Cal.App.3d 401 [183 Cal.Rptr. 898] [upholding rejection of alternatives to general plan amendment as infeasible because they would conflict with the city's growth management program]; 2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, § 17.29, pp. 824–825 (rev. 3/12).) As Wal-Mart argues, substantial evidence supports the City's finding rejecting the RDA as infeasible because, by excluding the four outparcels, it would not have satisfied the project objective of providing a mix of retail and restaurant tenants, thus providing residents with additional shopping and eating options. For this reason, the RDA was properly rejected as infeasible. Indeed, the RDA was properly rejected as infeasible even if it was environmentally superior to the *revised, approved project*, which was smaller than the RDA. (*California Native Plant Society v. City of Santa Cruz, supra*, 177 Cal.App.4th at pp. 1000–1001 [upholding rejection of environmentally superior alternatives as infeasible because they would not achieve policy objectives].)

## VII. DISPOSITION

The judgment is reversed. Real parties in interest shall recover their costs on appeal.

McKinster, Acting P. J., and Miller, J., concurred.

A petition for a rehearing was denied August 24, 2012, and on August 27, 2012, the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied December 12, 2012, S205804.